UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 12/15/2020
```

------------------------------------------------------------------X
:
KLS DIVERSIFIED MASTER FUND, L.P.,                        :
:
                                    Plaintiff,            :
                                                          :
                    -v-                                   :        19-cv-3774 (LJL)
                                                          :
SEAN MCDEVITT,                                            :        OPINION & ORDER
                                                          :
                                    Defendant.            :
                                                          :
------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

Plaintiff KLS Diversified Master Fund, L.P. ("Plaintiff" or "KLS") and Defendant Sean

McDevitt ("Defendant" or "McDevitt") each move for summary judgment pursuant to Federal

Rule of Civil Procedure 56.

For the following reasons, Plaintiff's motion is granted and Defendant's motion is denied.

## BACKGROUND

### I.    The Relevant Parties

Plaintiff KLS is a Cayman Islands Limited Partnership with a principal place of business

in New York. Non-party Sensei, Inc. ("Sensei" or the "Company") is a Delaware corporation

that has its principal place of business in Texas. It does business under the name "Kaviva" but

its legal name remains Sensei. Defendant McDevitt was an early investor in Sensei, and by

2014, he was the majority owner and Chief Executive Officer ("CEO") of Sensei. At the end of

2016, he was Sensei's CEO, Chairman, and majority stockholder. He was removed as CEO in

May 2018. McDevitt resides in Texas.

## II.     The Transaction

The events that form the basis of this case occur against the backdrop of a company struggling for survival.[1]

Sensei marketed itself as "the leading digital entertainment platform and mobile application that enables insurers, health systems, and employers to communicate with their members/employees, engage and educate across various benefits and wellbeing enhancement topics."  Dkt. No. 59 ¶ 4.  However, as of late 2016, Sensei—then doing business as a limited liability company—was losing money and running out of cash, it had few, if any, clients or revenue sources, and it faced six-figure obligations for accounts payable, payroll, royalty payments, legal fees, and several other categories of payables.  *Id.* ¶¶ 6, 11.  From at least 2014 through 2016, Sensei regularly deducted federal income taxes from employee paychecks and, instead of paying them and other payroll taxes to the government, it funneled those funds into its operations and accrued back taxes.  *Id.* ¶ 7.

Faced with those challenges, in 2016, Sensei entered into negotiations with KLS about KLS providing financing to Sensei.  *Id.* ¶ 8.  The investment was in the form of a promissory note.  In a transaction that closed on January 9, 2017, Sensei issued, and KLS purchased, a $3.33 million convertible promissory note, with a 4% annual coupon and a maturity date of two years from the date of execution (with an option for KLS to extend the maturity date by one year) for a purchase price of $2 million (the "Transaction").  *Id.* ¶ 10; Dkt. No. 53 ¶¶ 4-5.  The Transaction was implemented through three primary integrated documents: the secured convertible promissory note purchase agreement (the "Note Purchase Agreement") between KLS and Sensei, the secured convertible promissory note (the "Note") between KLS and Sensei, and the conditional guaranty by McDevitt (the "Conditional Guaranty").  Dkt. No. 59 ¶ 9; *see also* Dkt.

---

[1] The facts are undisputed unless otherwise noted.

Nos. 45-1, 45-2, 45-3.  All agreements were dated January 9, 2017.  McDevitt signed the Note and the Note Purchase Agreement on behalf of Sensei and signed the Conditional Guaranty in his individual capacity.  Dkt. No. 59 ¶ 10.

### A.    Note Purchase Agreement

Under the Note Purchase Agreement, KLS agreed to purchase the Note from Sensei for $2 million for Sensei to use as operating capital.  *See* Dkt. No. 45-2.  As reflected by the Note Purchase Agreement, and in connection with it, Sensei agreed to convert from a Florida limited liability company to a Delaware corporation and to form a board of directors of three persons, to be comprised of McDevitt and two KLS representatives.  *Id.* § 4.5; *see also* Dkt. No. 45-3 § C.

The Note Purchase Agreement contains a series of representations and warranties by both Sensei and KLS as of the date of closing.  *See* Dkt. No. 45-2 § 2 (Sensei representations); *id.* § 3 (KLS representations).  As relevant here, Sensei made representations concerning "Litigation" and "Agreements."  The "Litigation" representation stated as follows:

> There is no Action[2] pending or to the Company's knowledge, currently threatened (i) against the Company or any officer, director or Key Employee of the Company; (ii) that questions the validity of the Transaction Agreements or the right of the Company to enter into them, or to consummate the transactions contemplated by the Transaction Agreements, or (iii) that would reasonably be expected to have, either individually or in aggregate, a Material Adverse Effect.

*Id.* § 2.9.  The "Agreements" representation stated as follows:

> Except for the Transaction Agreements, there are no agreements, understandings, instruments or proposed transactions to which the Company is a party or by which it is bound that involve (i) obligations (contingent or otherwise) of, or payments to, the Company in excess of $50,000 . . .

*Id.* § 2.12(a).

---

[2] "Action" is defined broadly to mean "any claim, action, cause of action, demand, lawsuit, arbitration, inquiry, audit, notice of violation, proceeding, litigation, citation, summons, subpoena or investigation of any nature, civil, criminal, administrative, regulatory or otherwise, whether at law or in equity."  Dkt. No. 45-2 § 1.3(a).

Sensei's representations and warranties were qualified by an attached disclosure schedule (the "Disclosure Schedule").  Dkt. No. 45-5.  Under "Litigation," the Disclosure Schedule listed litigation threatened against Sensei for the failure to pay for software development services (and a $155,257.19 confession of judgment in connection with that dispute) and three collection efforts threatened against Sensei in amounts of $25,000, $8,700, and $1,500.  *Id.* § 2.9.  Under "Agreements," the Disclosure Schedule reflected, among other items, that Sensei owed debts to McDevitt in the amount of $480,824.  *Id.* § 2.12(a)(3).

The Disclosure Schedule also noted that Sensei had not paid its employees since the pay period ending September 15, 2016 and that the amounts owed had been accrued as liabilities on Sensei's financial statements.  *Id.* § 2.18(c)(1).  It further reflected, under Section 2.19, that Sensei owed back taxes for payroll in a number of states and federally and had not yet completed and filed its 2015 tax return.  *Id.* § 2.19(1)-(2).  Finally, the Disclosure Schedule reflected that, in addition for use as working capital, Sensei proposed to use $1,036,835 of the $2 million proceeds paid by KLS to pay pre-existing debt obligations and accrued payroll obligations.  *Id.* § 2.33.

**B.   The Note**

Under the Note, Sensei agreed to pay KLS interest on the principal sum of $3.33 million at a 4% annual interest rate compounded quarterly and to repay the entire outstanding principal balance and all unpaid accrued interest on the earliest of: (1) the two year anniversary of the issue date (January 9, 2017), (2) upon a company sale, or (3) upon the automatic acceleration of the Note as a result of an "Insolvency Event."  Dkt. No. 45-1 § 2.  The Note states that it is issued pursuant to the Note Purchase Agreement.  *Id.*

Under the Note, Sensei covenanted, among other things:

To provide weekly updates from CEO McDevitt via conference call or email, as requested by KLS, and to provide a quarterly business and financial update, *id.* § 5(b)(iv);

To make to KLS a "prompt report of any legal actions pending or threatened in writing against the Company," *id.* § 5(b)(vi); and

To "[t]imely file all required tax returns and reports and timely pay all foreign, federal, state, and local taxes, assessments, deposits and contributions owed by the Company," *id.* § 5(c).

Sensei also agreed to a series of negative covenants, including with respect to

dispositions, indebtedness, and investments. *Id.* § 6.

Importantly, the Note provided that if one or more of a series of "Events of Default"

occurred, the Note would accelerate and all principal and unpaid accrued interest would become

due and payable. *Id.* § 7. The Events of Default included:

(a)   Company fails to pay timely any of the principal amount due under this Note on the date and the same becomes due and payable or any accrued interest or other amounts due under this Note on the date the same becomes due and payable;

(b)   Company shall default in the performance of any covenant under this Note;

(c)   a Material Adverse Change occurs;
. . . .

(e)   . . . (ii) a notice of lien or levy is filed against any of Company's assets by any governmental authority . . .;

(f)   There is, under any agreement to which Company is a party with a third party or parties, (a) any default resulting in a right by such third party or parties, whether or not exercised, to accelerate the maturity of any Indebtedness in an amount individually or in the aggregate in excess of Fifty Thousand Dollars ($50,000); or (b) any breach or default by Company, the result of which could result in a Material Adverse Change;

(g)   one or more fines, penalties or final judgments, orders or decrees for the payment of money in an amount, individually or in the aggregate, of at least Fifty Thousand Dollars ($50,000) shall be rendered against Company by any governmental authority;

(h)   Company or any Person acting for Company makes any representation, warranty, or other statement now or later in this Note, any Note Transaction Document or in any writing delivered to [KLS] or to induce [KLS] to enter this Note or any Note Transaction Document, and such representation, warranty, or other statement is incorrect or misleading in any material respect when made;
. . . .

(j)   (i) Any guaranty of this Note terminates or ceases for any reason to be in full force and effect; (ii) any guarantor of this Note does not perform any obligation or covenant under any guaranty of this Note; (iii) any

> circumstance described in clause (c), (d), (e), (f) or (g) occurs with respect
> to any such guarantor; (iv) the occurrence of a "Recourse Event" as set
> forth in the Guaranty, dated as of January 9, by Sean McDevitt.

*Id.*

Finally, the Note granted a security interest to KLS in collateral to secure the payment

and performance of its obligations:

> Company hereby grants [KLS], to secure the payment and performance in full of
> all of the Obligations, a continuing security interest in, and pledges to Holder, the
> Collateral. The security interest granted herein is and shall at all times continue to
> be a first priority perfected security interest in the Collateral (subject only to
> Permitted Liens). Company hereby authorizes [KLS] to file financing statements
> with all appropriate jurisdictions to perfect or protect [KLS]'s interest or rights
> hereunder and take such other steps as [KLS] deems appropriate to perfect and
> protect the security interest granted pursuant hereto. [KLS], or its agents, shall
> have the right, at any time, to inspect the Collateral and audit and copy
> Company's Books.

*Id.* § 4. "Collateral" was defined as follows:

> [A]ll of the following personal property of Company, whether now owned or
> hereafter acquired: all accounts; all chattel paper; all commercial tort claims; all
> contracts; all deposit accounts, all documents; all general intangibles, including,
> without limitation, Intellectual Property; all goods, equipment, inventory and
> fixtures; all instruments, including, without limitation, all promissory notes; all
> investment property; all letter-of-credit rights; all money; all securities accounts;
> all supporting obligations; all other goods and personal property of Company,
> wherever located, whether tangible or intangible, and whether now owned or
> hereafter acquired, existing, leased or consigned by or to Company; and, to the
> extent not otherwise included, all proceeds of each of the foregoing and all
> accessions to, substitutions and replacements for and rents, profits and products of
> each of the foregoing.

*Id.* § 15.

## C.   The Conditional Guaranty

Finally, and "[a]s an essential inducement of and condition to" KLS purchasing the Note,

"and in consideration therefor," McDevitt signed the Conditional Guaranty.  Dkt. No. 45-3 § D.

Pursuant to Section 1 of the Conditional Guaranty, McDevitt agreed that he would "be fully and

personally liable for the payment and performance of any then remaining obligations of the

Company set forth in the Note" provided any one of six "Recourse Events" occurs. *Id.* § 1. As relevant here, those Recourse Events included the following:

a. any fraud or intentional or willful misrepresentation by [McDevitt or Sensei], or any intentional or willful failure to disclose a material fact in connection with the issuance of the Note or at any time the Note is outstanding;

b. any gross negligence, willful misconduct, or commission or a criminal act by [Sensei], or any gross negligence, willful misconduct, or commission of felony or other crime by [McDevitt] that (i) involves moral turpitude or dishonesty by [McDevitt], or (ii) could materially and adversely affect Company, the Company's prospects or the prospects of repayment of the Note;

c. any material breach of the material terms of the Note (including, without limitation, with respect to restrictions on indebtedness, liens, dispositions of assets, distributions in respect of capital stock, payments of subordinated indebtedness, intellectual property, or affiliate transactions) directly or indirectly caused by Guarantor;
. . . .
e. any litigation or other legal proceedings is brought by current or former employees of [Sensei] that materially and adversely affects Company, the Company's prospects or the prospects of repayment of the Note and any such litigation or other legal proceedings arise from circumstances (i) which were caused directly or indirectly by [McDevitt] or (ii) which [McDevitt] knew or should have known to exist after conducting reasonable investigations;

f. the Company becomes liable for any taxes, penalties, fees or similar charges under foreign, federal, state or local tax laws or applicable rules or regulations, the payment of which would materially and adversely affect Company, the Company's prospects or the prospects of repayment of the Note, and any such liability arises from circumstances not described in Section 2.19 of the Disclosure Schedule to the Purchase Agreement[3] (i) which were caused directly or indirectly by [McDevitt] or (ii) which [McDevitt] knew or should have known to exist after conducting reasonable investigations.

*Id.*

---

[3] As stated *supra*, Section 2.19 of the Disclosure Schedule referred to Sensei's tax returns and payments.

The Conditional Guaranty provided that "[u]pon the occurrence of a Recourse Event, Guarantor shall pay the Guaranteed Obligations in full in cash upon demand by Holder [KLS]." *Id.* "Guaranteed Obligations" were defined as "any then remaining obligations of the Company set forth in the Note." *Id.*

Finally, under the Conditional Guaranty, McDevitt "acknowledges that it is relying upon its own knowledge of and is fully informed with respect to Company's financial condition" and that:

> [McDevitt] assumes full responsibility for keeping fully informed of Company's financial condition and all other circumstances affecting Company's ability to perform the Guaranteed Obligations, and agrees that [KLS] will have no duty to report to [McDevitt] any information which [KLS] receives about Company's financial condition or any circumstances bearing on Company's ability to perform all or any portion of the Guaranteed Obligations.

*Id.* § 5.

The Conditional Guaranty contained the acknowledgement that McDevitt would "obtain substantial direct and indirect benefits from the issuance of the Note." *Id.* § E.

## III.    KLS Allegations of Recourse Events

Sensei's travails continued after the Transaction closed on January 9, 2017. Those challenges, and the disclosures and actions that were made both before and after the Note was sold to KLS, form the basis for KLS's action seeking to enforce the Conditional Guaranty. They fall into three general categories.

### A.    Porter Wright Agreements and Threatened Litigation

On March 14, 2014, before Sensei began its negotiations with KLS and almost three years before the Transaction, Sensei entered into an agreement with Porter Wright Morris & Arthur ("Porter Wright") to represent it in connection with a private placement of securities by Sensei. The written agreement succeeded a 2013 oral agreement with Porter Wright to provide

services jointly to McDevitt and Sensei (together, with the written agreement, the "Porter Wright Agreements").  Dkt. No. 59 ¶ 13.

The written agreement was addressed to Sensei, care of McDevitt as Manager and CEO. It listed the services Porter Wright would perform on behalf of Sensei but recited that "since the Company is not yet established, we will look to you individually for payment of any outstanding invoices in the event the Company does not pay such invoices in a timely manner."  Dkt. No. 45-9.

Thereafter, Porter Wright issued invoices to McDevitt and to Sensei for services rendered.  On June 26, 2014, Porter Wright invoiced McDevitt approximately $125,201.97.  Dkt. No. 45-10; Dkt. No. 45-15, Ex. A.  On December 12, 2014, Porter Wright issued two invoices to Sensei totaling approximately $35,857.04.  Dkt. No. 45-10.

Sensei and McDevitt did not pay their bills.  In an email to McDevitt dated November 25, 2015, Mary Beth M. Clary of Porter Wright said that her "firm wants to sue you [McDevitt] personally and Sensei for payment."  Dkt. No. 45-11.  The email stated, in full:

> Sean,
>
> You've not answered any of my emails.  I know you are struggling financially, but it really disappoints me when you ignore me.  I have always trusted you and believed that when you say something, you will follow through.  You made a commitment to me to pay Porter Writer $5,000 per month.  After the first payment in September and a $50 payment in early October, we've not heard anything from you or Sensei. I think after all these years, I deserve better than that. If you can't make the promised monthly payment, you should have told me and we could have worked out a different payment plan.
>
> We are now at a crossroads.  *My firm wants to sue you personally and Sensei for payment.*  I've held them off thinking that is not the best approach for any of us.  *But if you don't communicate with me, I don't think there is any other choice.*  Let me know if that is what you want.  *If you do not respond to this email within the next 7 days, that will say it all.*

*Id.* (emphasis added).

Sensei did not list either of the Porter Wright Agreements or the threat by Porter Wright to institute litigation in the Disclosure Schedule it provided in connection with the Note Purchase Agreement.

At the time of the Transaction's closing, in January 2017, McDevitt claims that he personally owed $125,000 and Sensei owed $35,000 to Porter Wright.  Dkt. No. 53 ¶ 14. Plaintiff disputes that the $125,000 amount was owed by McDevitt alone; it states that McDevitt and Sensei jointly owned $125,000 to Porter Wright.  Dkt. No. 58 ¶ 14.

On April 26, 2017, four months after the Transaction, Porter Wright filed a complaint against Sensei and McDevitt in the County Court for the Twentieth Judicial Circuit in Collier County, Florida.  Dkt. No. 45-10.  It alleged that Sensei had failed to make payments to Porter Wright under the written agreement, causing Porter Wright damages in the amount of the $35,307.04 it was owed under that agreement plus accrued interest at the time of the filing of that action.  *Id.* ¶¶ 14, 25.  Porter Wright brought claims of breach of contract, open account, account stated, and quantum meruit/unjust enrichment against Sensei.  With respect to the oral agreement, the complaint listed under the header, "general allegations as to Sean D. McDevitt and Sensei, LLC," that "[i]n 2013 and 2014, McDevitt hired Plaintiff to provide[] certain Services to McDevitt and Sensei pursuant to an oral contract and an open account" and "[s]pecfically, on or around September 2013, Defendant McDevitt hired Plaintiff to assist him with the acquisition, reorganization and merger of Sensei, Inc. and Sensei Acquisitions, LLC." *Id.* ¶¶ 15-16.  The complaint brought a claim of breach of oral contract against only McDevitt seeking damages of $125,431.97, and brought claims of open account, account stated, and quantum meruit/unjust enrichment against both McDevitt and Sensei seeking the same damages amount.  *Id.* ¶¶ 54, 59, 67-68, 76.  Attached to the complaint were two letters from Porter Wright

addressed to McDevitt: one advised him that "Sensei, LLC is indebted to Porter Wright, Morris & Arthur LLP in the sum of $35,307.04" and the other advised him that "you are indebted to Porter Wright, Morris & Arthur LLP in the sum of $125,431.97." *Id.*, Exs. C, E.

Sensei and McDevitt did not disclose the Porter Wright complaint to KLS when it was filed.

On or about September 20, 2017, McDevitt entered into a settlement agreement with Porter Wright on behalf of himself and Sensei. The agreement required Sensei and McDevitt, defined as defendants, to pay Porter Wright a total of $80,000 in settlement of the lawsuit. Dkt. No. 45-18.

Three months later, in December 2017, an update report was sent on behalf of McDevitt to the two other Sensei board members, who also were KLS representatives. Dkt. No. 45-17. It included a discussion of "Legal matters" that disclosed a lawsuit filed against Sensei to recover on a finder's agreement (discussed below) and another disagreement totaling $10,000. *Id.* Notably, it contained no mention of the Porter Wright lawsuit or the Porter Wright settlement agreement.

McDevitt and Sensei are alleged to have breached the settlement, and Porter Wright brought suit against Sensei and McDevitt to recover outstanding amounts owed under the terms of the settlement agreement. KLS learned about the lawsuit on May 30, 2018 when McDevitt sent the related filings to Ashley Reynolds ("Reynolds"), who had replaced McDevitt as CEO of Sensei, and Reynolds forwarded them to KLS. Dkt. No. 45-20 (email from Reynolds to KLS, "This is mostly FYI but it appears Porter Wright is now suing Sean"). In June 2018, McDevitt informed KLS that he alone would be resolving the Porter Wright legal matter. Dkt. No. 59 ¶ 22.

On June 27, 2018, the county court entered a final judgment in favor of Porter Wright and against Sensei and McDevitt "jointly and severally" in the total amount of $152,196.51.  Dkt. No. 45-21.

### B.       Finder's Agreement and Litigation

Sometime in 2016, and before the Transaction, Sensei entered into a Compensation, Non-Circumvention, and Non-Disclosure Agreement ("Finder's Agreement") with Jonathan Schwartz ("Schwartz"), an individual who was identified as having relationships with third parties and investment banking entities involved in investing in early stage companies.  Dkt. No. 45-22.[4]  The Finder's Agreement states that it "is made as of November 6, 2015" by Sensei and "its officers, principals, affiliates, related entities, and any entities owned or controlled by them" "in favor of" Schwartz.  *Id.*  It is signed by McDevitt as CEO of Sensei and by Schwartz, but there are no dates next to the signatures.  It contemplated that Schwartz would be compensated if a third party with whom Schwartz had a relationship either invested in Sensei or later found an investor for Sensei.  In particular, the Finder's Agreement stated that, if one of these third parties invested in Sensei or introduced Sensei to an investor, then Schwartz was to be paid a finder's fee in the amount of 7% of that investment to be paid simultaneously with the investment.  In addition, the Finder's Agreement also provided that, if Sensei executed an investment in violation of the Finder's Agreement (e.g., by not paying Schwartz simultaneously), then Schwartz would be entitled to a commission from Sensei of 15% of the total value of the transaction in addition to any other compensation due Schwartz.

---

[4] McDevitt has claimed in a sworn affidavit that the agreement was executed in late September 2016 but that they backdated the agreement to November 6, 2015.  Dkt. No. 45-28 ¶ 15.  He also submits email correspondence that shows Schwartz sending him the executed agreement on September 12, 2016.  Dkt. No. 49-7.

The Finder's Agreement was not disclosed to KLS or listed in the Disclosure Schedule to the Note Purchase Agreement.

On June 2, 2017, Schwartz filed a lawsuit in the Southern District of New York against Sensei, claiming that he had identified an investment banking entity, Odeon Capital Group, LLC ("Odeon"), to invest in Sensei and was entitled to a finder's fee under the Finder's Agreement. Dkt. No. 45-23.[5] Specifically, Schwartz alleged that he had introduced Sensei to Odeon in March 2016, that Odeon had identified KLS as an investor which then went on to invest $2 million in Sensei through the Transaction in January 2017, and that Schwartz demanded payment of the 7% fee on January 13, 2017 but that Sensei and McDevitt had not responded to the demand. *Id.* ¶¶ 40, 46-47. The complaint further recited that, on February 9, 2017, Schwartz's attorneys had written to Sensei demanding that, in addition to the 7% fee of the $2 million investment (or $140,000), Sensei pay Schwartz the liquidated damages amount of $300,000 (representing 15% of the $2 million investment). *Id.* ¶ 50. The complaint alleges that Sensei had refused to pay on the grounds that Schwartz was acting as an unregistered broker-dealer. *Id.* ¶ 51. In the lawsuit, Schwartz claimed that Sensei breached the Finder's Agreement by failing to pay him either the 7% fee or the liquidated damages, and he sought damages in an amount not less than $300,000. Sensei, not McDevitt, was the only named defendant.

McDevitt learned of the suit shortly after the June 2, 2017 filing date. Dkt. No. 59 ¶ 31; Dkt. Nos. 45-24, 45-26; *see also* Dkt. No. 45-25 ("In June of 2017, Sensei was notified by Jack Martel, Sensei's attorney, that a complaint had been filed with a court in New York."). An email from Sensei's counsel to McDevitt and Sensei's Chief Financial Officer, Alexander Furer ("Furer"), dated June 8, 2017, forwarded an email from Schwartz's counsel, attaching a copy of

---

[5] *See Schwartz v. Sensei, LLC*, No. 17-cv-4124 (S.D.N.Y.).

the complaint.  Dkt. No. 45-26.[6]  McDevitt maintains that Schwartz did not identify any investor

who invested in Sensei, but rather that a person named Edmund Zack ("Zack") provided Odeon's

contact to him and that Odeon identified Sensei.  Dkt. No. 53 at 8-9.

Sensei and McDevitt did not disclose either the February 9, 2017 demand or the June 2,

2017 lawsuit to KLS.  Dkt. No. 59 ¶ 32.

Sensei did not answer the complaint or appear in the Schwartz litigation.  On September

27, 2017, the Honorable Robert W. Sweet, District Judge, to whom the case was assigned,

entered a default judgment in favor of Schwartz and against Sensei for $395,492.60 plus

post-judgment interest.  Dkt. No. 45-27.

McDevitt claims to have learned of the default judgment on November 8, 2017, when he

observed that Sensei's operating account had a $0 balance and that the funds in the operating

account had been garnished.  Dkt. No. 45-25.  He retained a law firm to represent Sensei on

November 9, 2017 and reported the Schwartz lawsuit to Sensei's board (i.e., himself and the two

KLS representatives) on November 10, 2017. *Id.*; Dkt. No. 45-24; *see also* Dkt. No. 59 ¶ 32.  In

that same report, McDevitt informed KLS that the most likely outcome, based on advice from

counsel, would be that Sensei would have to pay $140,000 over an extended period of time as

well as attorneys' fees.  Dkt. No. 45-25.  Notwithstanding the June 2017 email from counsel to

McDevitt and Furer attaching the complaint, McDevitt stated that he did not have a copy of the

formal complaint document. *Id.*

On November 15, 2017, Sensei sought a temporary restraining order and preliminary

injunction preventing Schwartz from executing on the default judgment; it submitted a

---

[6] In an affidavit filed in the Schwartz litigation in support of vacatur of the default judgment,
McDevitt asserted that the first time Sensei knew of the existence of this action was on or about
November 8, 2017.  Dkt. No. 45-28 ¶ 20.

declaration of McDevitt in support of the application.  Dkt. No. 45-28.  In the declaration, McDevitt asserted that the first time Sensei learned about the existence of the action and the default judgment was on November 8, 2017.  *Id.* ¶ 20.  He also asserted that Schwartz's "execution on its improperly obtained default judgment is causing irreparable harm to [Sensei]," *id.* at 7, and that "[t]he freezing of [Sensei's] operating and business accounts . . . has prevented [Sensei] from continuing to operate its business," *id.* ¶ 26.  McDevitt went on to state that the "harm caused by freezing the two Silicon Valley Bank accounts is devastating to [Sensei's] business, the lives of its employees, and the lives of its customers."  *Id.* ¶ 31.

The litigation premised on the Finder's Agreement resulted in legal fees of at least $58,142.52 as of November 5, 2018.  Dkt. No. 59 ¶ 36; Dkt. No. 45-29 at 4.

The default judgment was ultimately vacated on November 30, 2017.  The case was referred to the Honorable Sarah Netburn, Magistrate Judge, for settlement in April 2018 and for all purposes in September 2018.  *See Schwartz v. Sensei, LLC*, 2020 WL 5817010, at *2-3 (S.D.N.Y. Sept. 30, 2020).  The parties reached a settlement and the court dismissed the action with prejudice on September 5, 2018.  However, the parties were unable to finalize the settlement agreement and the action was restored to the court's calendar on February 13, 2019.  Schwartz filed an amended complaint that added McDevitt, Furer, and Odeon as defendants.[7] Each of the defendants moved to dismiss.

On February 14, 2020, the court denied Sensei's motion to dismiss as moot because Sensei consented to entry of a default judgment.  The court said it would address the issue of damages after a decision on the remaining motions to dismiss.

---

[7] A "court may take judicial notice of [] document[s] filed in another court 'not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings.'"  *Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc.*, 146 F.3d 66, 70 (2d Cir. 1998) (quoting *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991)).

On September 30, 2020, the court dismissed the complaint against McDevitt, Furer, and Odeon, and said it would address the allegations against Sensei separately. *See id.* at *11. For the purposes of analyzing liability for McDevitt and Furer, and without ruling on Sensei's liability, the court found that Schwartz stated a plausible claim that Sensei breached the Finder's Agreement by failing to pay Schwartz a finder's fee for his introduction of Sensei to Odeon who in turn introduced Sensei to KLS. But the court declined to pierce the corporate veil for the breach of contract claim and other state law claims as to McDevitt and Furer and thus dismissed all claims against them.[8] The sole remaining defendant in that action is now Sensei.

## C.  Failure to Timely File and Pay Taxes

From at least 2014, Sensei had a practice of withholding payroll taxes from employees but not remitting those funds to the appropriate state or federal tax authorities. Plaintiff learned of this practice during due diligence on the Transaction. Dkt. No. 59 ¶ 39. The practice also was disclosed in the Disclosure Schedule, which noted that Sensei "owes back taxes for payroll in a number of states and federally." Dkt. No. 45-5.

As described above, in the Note, Sensei had covenanted to "[t]imely file all required tax returns and reports and timely pay all foreign, federal, state, and local taxes, assessments, deposits and contributions owed by the Company." Dkt. No. 45-1. In the Conditional Guaranty, McDevitt had agreed to pay any amounts then due and owing under the Note if either of the following Recourse Events had occurred:

> (1) under Recourse Event (c), there was "a material breach of the material terms of the Note (including, without limitation, with respect to . . . liens) . . . directly or indirectly caused by [McDevitt]," or
>
> (2) under Recourse Event (f), "the Company becomes liable for any taxes, penalties, fees or similar charges under foreign, federal, state or local tax laws or

---

[8] The court dismissed the claims brought against Odeon for reasons not relevant to this opinion. *See Schwartz*, 2020 WL 5817010, at *5.

applicable rules or regulations, the payment of which would materially and adversely affect [the] Company, the Company's prospects or the prospects of repayment of the Note, and any such liability arises from circumstances not described in Section 2.19 of the Disclosure Schedule to the Purchase Agreement which were caused directly or indirectly by [McDevitt] or which [McDevitt] knew or should have known to exist after conducting reasonable investigations."

Dkt. No. 45-3.

On August 9, 2017, the Georgia Department of Revenue issued a lien against Sensei for $55,464.30.  Dkt. No. 45-36.

In addition, after the closing of the Transaction and while the Note was still outstanding, Sensei failed to timely file and pay its federal taxes for the first and second quarters of 2018, resulting in thousands of dollars of penalties for Sensei.  Dkt. No. 59 ¶¶ 37, 41.  In the summer of 2018, McDevitt with the help of his tax advisor belatedly filed federal tax forms (without payment) for Sensei's third quarter 2016; the late filing resulted in a $10,700.19 penalty for filing tax returns after the due date, $4,779.72 in added interest, and over $12,000 in additional penalties for late filing and federal tax deposit penalties.  *Id.* ¶ 40; Dkt. No. 45-31 at 27-28.

Sensei also failed to timely make tax payments to various state authorities.  Between January 1, 2018, and May 25, 2018, Sensei made no tax payments and owed money for California state unemployment insurance tax and employment training tax, federal unemployment tax, Georgia unemployment tax, and Texas unemployment tax.  Dkt. No. 59 ¶ 42; Dkt. No. 45-34.  In that same time period, Sensei made incomplete payments and owed money for California personal income tax and state disability tax and Georgia income tax.  Dkt. No. 59 ¶ 42.  The Georgia Department of Revenue showed a late filing and an outstanding balance of $1,076.65 as of March 31, 2017, and a delinquent filing for March 31, 2018.  *Id.* ¶ 43; Dkt. No. 45-35.

### 1.    KLS Demands That McDevitt Personally Pays Sensei's Taxes

On May 17, 2018, McDevitt was terminated as CEO of Sensei and was replaced by Reynolds.  Dkt. No. 59 ¶ 61; Dkt. No. 45-57.

On May 31, 2018, McDevitt wrote to KLS that he was "actively pursuing liquidity to make a $350,000 contribution to the company to address back taxes."  Dkt. No. 59 ¶ 47; Dkt. No. 45-38.  The next day, he wrote to KLS with an update on his "liquidity to pay the taxes as discussed."  Dkt. No. 45-39.  He had "$250,000 available next week" and was "[w]orking on the last $100,000" and "[e]xpect[ed] to have that soon."  *Id.*

On June 6, 2018, McDevitt wired $51,237.99 to Sensei's operating account to pay for Connecticut, Georgia, and California back taxes.  Dkt. No. 49-10; Dkt. No. 60-32.  On June 15, 2018, McDevitt wired $6,000 to Sensei's operating account to pay for additional taxes and penalties due to Georgia.  Dkt. No. 49-10; Dkt. No. 60-33.  Between June and July 2018, McDevitt made various other deposits into Sensei's operating account that he claims were intended to pay for Sensei's tax obligations.  Dkt. No. 58 ¶ 53; Dkt. No. 49-10.  All together, these deposits totaled $165,202.28.  Dkt. No. 58 ¶ 53; Dkt. No. 49-10.  He also made payments to state departments in varying amounts.  Dkt. No. 49-11.

On June 27, 2018, McDevitt wrote again to KLS that he would keep KLS "informed on the tax and legal matters" and that "[w]e have almost all of them resolved and I expect to have the federal taxes resolved soon."  Dkt. No. 45-40.

On August 2, 2018, McDevitt wrote to KLS: "Good news on selling assets to meet the $300K escrow demand.  I expect to have the balance within the week."  Dkt. No. 45-41.

On August 14, 2018, KLS sent an email to McDevitt with the subject line "SEAN WHERE ARE WE ON FUNDS?" without text in the body of the email.  *Id.*  McDevitt responded that same day to say that he was "currently unwinding some illiquid investments that I

have in real estate" that he was "having to sell . . . at a discount" and that "[b]ottom line, it will probably take another two weeks before I have the cash in hand."  *Id.*

KLS responded the same day, saying that it was "unacceptable" because on August 2, McDevitt had "told us you expected to have the rest of the 300k by the <u>end of last week</u>" and "[w]hen we followed up last week you said you expected it to come <u>this week</u>."  *Id.*  KLS further stated it was "not sure you appreciate the financial position the Company is currently in. With working capital swings, there will be a point in the near term where the Company is insolvent." *Id.*  McDevitt replied, "I understand the frustration. If the company is wound down, I, alone, bear a gigantic liability."  *Id.*

### 2.    Offer in Compromise

At least as early as June 2018, McDevitt asked his tax advisors at Joe Mastriano P.C. ("JMPC") to help Sensei with an Offer in Compromise ("OIC"), a process that allows companies that have minimal assets, and therefore cannot afford to pay to settle large liabilities, to settle their tax liabilities for less than the full amount owed.  Joe Mastriano ("Mastriano") and Lekshmy Ravindranathan ("Ravidranathan," and also known as Linda Pologruto) worked on the OIC.  Dkt. No. 45-43; Dkt. No. 48-4.

> On September 6, 2018, McDevitt emailed a KLS representative to inform him that:
>
> Our advisors have been in communication with the IRS and both sides are moving forward on an Offer in Compromise of $19,920 to settle the legacy IRS taxes. Please see the draft submission. Our advisors are planning to submit the Offer in Compromise soon and are asking for a payment of $5,000 to continue work.

Dkt. No. 45-48.  When asked by KLS whether the OIC was "agreed upon by the IRS through these talks," McDevitt responded that his "advisors have told me that they believe this is the amount the IRS will agree to" and that they have had "multiple conversations with the IRS to arrive at this number."  *Id.*

On October 21, 2018, McDevitt emailed the KLS representatives that an OIC "is currently being negotiated with the IRS," that he "expect[s] to have updates every couple of weeks until the offer in compromise is fully agreed to and settled," and that Sensei "is not under any threat of collection in the meantime, as we are pursuing a settlement."  Dkt. No. 45-50.

On October 25, 2018, McDevitt stepped down as Chairman of Sensei's board and was replaced with Patrick Cua ("Cua").  Dkt. No. 59 ¶ 62; Dkt. No. 45-58.

 On November 17, 2018, McDevitt emailed Cua and Reynolds only—not KLS representatives—to announce that "[w]e achieved a great deal with the IRS," "[w]e are awaiting final approval of the pay structure of the Offer in Compromise," and "[w]e expect final approval very soon."  Dkt. No. 45-52.

On November 28, 2018, an OIC was submitted to the IRS on behalf of Sensei to resolve Sensei's federal taxes.  The OIC set forth a minimum offer of $16,351.88.  McDevitt was listed as the primary contact on the OIC form despite Reynolds being CEO of Sensei.  Dkt. No. 45-51; Dkt. No. 48-5.

On December 10, 2018, Reynolds emailed the KLS representatives to inform them that the OIC had been filed but that they needed to "send two checks as per Sean's email in order to start the process of IRS review of our OIC and subsequent acceptance."  Dkt. No. 48-8.  He said that the "process is a tad more complex than previously described" and that "unfortunately," they would not "know how complex until we provide the IRS with the initial payment" of the two checks.  *Id.*  He also said that Sensei did not currently have a contract with Mastriano's office to provide his tax advisory services because Mastriano had been operating under an older agreement with McDevitt.  Mastriano requested that Sensei execute a contract with a $5,000 down payment and $195 per hour with a total estimate of fees between $12,000 and $15,000.  *Id.*

On December 11, 2018, Reynolds emailed KLS to state that he and Cua agreed that "it makes sense for us to pursue our course with Mastriano/OIC and work with the offer that's on the table." *Id.* That meant drafting the initial OIC checks totaling $3,500 and signing a contract with Mastriano that would "require an additional $5k payment to them." *Id.* After Reynolds confirmed that Sensei had sufficient funds in the operating accounts for such a course of action, a KLS representative responded, "Ok. Agreed then." *Id.*

On December 17, 2018, KLS emailed McDevitt after Sensei received an email from Mastriano claiming Sensei owed it money for prior work done. Dkt. No. 45-55. McDevitt responded that he had already paid for Sensei-related work by both Sensei and himself. He also said, "My recommendation as stated often has been to pay the two checks to the IRS totaling (one for $186 and one for about $3,200ish) so that the Offer in Compromise can be wrapped up and put to bed." *Id.* He added, "My recommendation is also that those checks be paid and the countersignature be obtained by the end of the year as the agent wants to close this account out." *Id.* Later in the email thread, on the same date, McDevitt relayed a history of the OIC: "We reached an Offer in Compromise for approximately $16K to settle past IRS taxes for 2014-2016 in November of this year. In order to get the countersigned OIC documents, two checks have to be received by the IRS. One check is for $186 and the other for 20% of the OIC amount....about $3,100. All of this documentation has been made available to Ashley. I assume he has shared it with you." *Id.*

On December 19, 2018, Reynolds emailed the KLS representatives to relate a discussion he had with Cua. He said, "We both agree and feel as you both do about Mastriano and Sean; however, Pat [Cua] made several points that I agree with." Dkt. No. 48-8. He noted that Sensei was "starting at a substantial deal of $16k to satisfy well over $500k in back taxes and there is no

guarantee that our next tax representation will come up with the same amount." *Id.* Moreover, the amount paid to Mastriano for his services "is negligible (approx.. $8,200 ($3,200 fee to IRS + $5k payment to Mastriano)" and that "[t]ransitioning to new representation at this point will put us backwards by at least 6 mos." *Id.* Reynolds noted that Ravindranathan at JMPC "is both a CPA and an attorney and we doubt she would jeopardize her credentials by lying to us about the OIC." Reynolds suggested "offer[ing] performance-based pricing to Mastriano and defer any cash outlay now." *Id.*

On January 4, 2019, Reynolds emailed the KLS representatives again, saying he had negotiated the down payment to Mastriano from $5,000 to $2,000 and asked if he had their permission to send the payment. *Id.* KLS responded, "No." and asked "Whats the feedback from the schwartz side about giving us some time to evaluate and get up to speed?" *Id.*

Plaintiff decided not to pursue an OIC and ultimately advanced a line of credit of up to $720,000 to Sensei to pay off its tax liabilities. Dkt. No. 45-16 ¶ 14. Sensei used $570,000 of that credit to pay off the liabilities. *Id.* Plaintiff asserts that Sensei does not have the assets to repay the loan. *Id.*

## IV. KLS Foreclosure on Sensei's Assets

Sensei did not pay the $3.33 million in principal owed to Plaintiff upon the Note's maturity date on January 9, 2019. On January 29, 2019, Plaintiff sent a notice to Reynolds and Cua at Sensei that pursuant to the Note, KLS would sell at a public sale all of Sensei's assets, including its intellectual property, that was the collateral pledged due to Sensei's default. Dkt. No. 48-1, Ex. 11. As a result of the foreclosure sale, KLS did not obtain any money, but rather ended up with title to Sensei's collateral. Dkt. No. 48-1 at 293:20-296:3; *see* also Dkt. No. 58 ¶ 67.

## PROCEDURAL HISTORY

KLS filed this action with a breach of guaranty claim on April 26, 2019 to recover $3.6 million from McDevitt, which it alleges is the payment due under the Note, including accrued interest to date.  Dkt. No. 1 ¶ 5.  McDevitt filed an answer on July 15, 2019.  Dkt. No. 13.  The case proceeded under the Honorable Debra C. Freeman, Magistrate Judge, for general pretrial purposes.  Dkt. No. 15.

The action was transferred to the undersigned on February 6, 2020.

KLS and McDevitt each filed a motion for summary judgment on June 5, 2020.  Dkt. Nos. 39, 42.  They filed their opposition briefs on June 22, 2020, Dkt. Nos. 55, 57, and their reply briefs on June 29, 2020, Dkt. Nos. 63, 66.  Within McDevitt's opposition brief, he also moved to strike KLS's Rule 56.1 Statement and memorandum in support of its motion for summary judgment.  Dkt. No. 57.  Oral argument was held on December 4, 2020.

## LEGAL STANDARD

Summary judgment is appropriate when the record shows that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "An issue of fact is 'material' for these purposes if it 'might affect the outcome of the suit under the governing law,'" while "[a]n issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  *Konikoff v. Prudential Ins. Co. of Am.*, 234 F.3d 92, 97 (2d Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  In determining whether there are any genuine issues of material fact, the Court must view all facts "in the light most favorable to the non-moving party," *Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008), and the movant bears the burden of demonstrating that "there is no genuine dispute as to any material fact," Fed. R. Civ. P. 56(a).

If the movant meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008). It may not rely on "mere speculation or conjecture as to the true nature of the facts," *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted), or "on the allegations in [its] pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible," *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (internal citation omitted). Rather, to survive a summary judgment motion, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record," Fed. R. Civ. P. 56(c)(1)(A), and demonstrating more than "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). If "the party opposing summary judgment propounds a reasonable conflicting interpretation of a material disputed fact," summary judgment shall be denied. *Schering Corp. v. Home Ins. Co.*, 712 F.2d 4, 9-10 (2d Cir. 1983).

Local Civil Rule 56.1 of the Local Rules for the Southern District prescribes the manner and method in which a party is to present undisputed issues of fact to the Court. The moving party must annex to its notice of motion "a separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried." S.D.N.Y. Loc. Civ. R. 56.1(a). The party opposing the motion must "include a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party, and if necessary, additional paragraphs containing a separate, short and concise statement of additional material facts as to which it is contended that there exists a

genuine issue to be tried." S.D.N.Y. Loc. Civ. R. 56.1(b). All statements in a Local Rule 56.1

submission "must be followed by citation to evidence which would be admissible." S.D.N.Y.

Loc. Civ. R. 56.1(d). "Each numbered paragraph in the statement of material facts set forth in

the statement required to be served by the moving party will be deemed to be admitted for

purposes of the motion unless specifically controverted by a correspondingly numbered

paragraph in the statement required to be served by the opposing party." S.D.N.Y. Loc. Civ. R.

56.1(c).

Pursuant to Local Civil Rule 56.1, the movant's "statements are deemed to be admitted

where [the non-moving party] has failed to specifically controvert them with citations to the

record." *Knight v. N.Y.C. Hous. Auth.*, 2007 WL 313435, at *1 (S.D.N.Y. Feb. 2, 2007); *see,*

*e.g.*, *Cayemittes v. City of N.Y. Dep't of Hous. Pres. & Dev.*, 974 F. Supp. 2d 240, 243 (S.D.N.Y.

2013) (holding that denials that are not supported by citations to admissible record evidence are

to be disregarded); *see also N.Y. Teamsters Conf. Pension & Ret. Fund v. Express Servs., Inc.*,

426 F.3d 640, 648-49 (2d Cir. 2005) (upholding grant of summary judgment where "[t]he district

court, applying [Northern District of New York's analogue to S.D.N.Y. Loc. Civ. R. 56.1]

strictly, reasonably deemed [movant's] statement of facts to be admitted" because the non-

movant submitted "offered mostly conclusory denials of [movant's] factual assertions and failed

to include any record citations"); *Colton v. N.Y. Div. of State Pol.*, 2017 WL 5508911, at *2

(N.D.N.Y. Feb. 8, 2017) ("The failure to properly controvert a supported statement of fact by

pointing to admissible evidence contravening the movant's evidence results in the movant's

statement being deemed admitted.").

**DISCUSSION**

## I.     **Defendant's Motion to Strike**

In his brief opposing Plaintiff's motion for summary judgment, Defendant asks the Court to strike Plaintiff's Rule 56.1 Statement and its memorandum of law on the grounds that they are "replete" with unfounded factual assertions and legal arguments and that the same statements that appear in Plaintiff's memorandum of law also appear in the Rule 56.1 statement.  He further argues that the Court should strike the declaration of Michael Zarrilli ("Zarrilli"), Dkt. No. 45-16, in support of Plaintiff's motion for summary judgment as not based on personal knowledge.  The application is denied.

### A.     **Rule 56.1 Statement and Memorandum of Law**

With one arguable exception, Plaintiff's Rule 56.1 Statement conforms to the local rule requirement that statements submitted in support of a motion for summary judgment should include "a separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried."  S.D.N.Y. Loc. Civ. R. 56.1(a).  The statements about which Defendant complains, for the most part, are simple and concise statements of what Plaintiff contends to be undisputed material facts.  They include that: "Sensei's financial status was weak," Dkt. No. 47 ¶ 19; "McDevitt knew, or should have known, of Sensei's tax liabilities accruing after January 9, 2017. McDevitt also caused and knew about the late filings," *id.* ¶ 45; "McDevitt's misrepresentations resulted in Sensei facing additional taxes and penalties," *id.* ¶ 58; and "[n]either Sensei nor McDevitt have paid the amounts owed to KLS" and "[t]o date, the entire $3.33 million, plus accrued interest, remains outstanding," *id.* ¶ 64.

Some of these factual assertions may have legal meaning and legal consequences, such as that the claim that "McDevitt knew, or should have known, of Sensei's tax liabilities."  *Id.* ¶ 45.

Others, Defendant argues, are not supported by the evidence.  But "the Court can also disregard legal conclusions or unsubstantiated opinions in a Local Rule 56.1 statement." *Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona*, 138 F. Supp. 3d 352, 394 (S.D.N.Y. 2015), *aff'd sub nom. Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona, NY*, 945 F.3d 83 (2d Cir. 2019); *see also Simmons v. Woodycrest Ctr. for Human Dev., Inc.*, 2011 WL 855942, at *1 n.1 (S.D.N.Y. Mar. 9, 2011) (disregarding plaintiff's responding statement of undisputed facts that did "not cite to record evidence to support any of its contentions," and where "several of its 'facts' are, in actuality, legal conclusions").  This Court is capable of reading the statements and the evidence and of citing to the statements only insofar as they are supported by the evidence, and it has done so in this opinion.

The single exception is paragraph 57 of Plaintiff's Rule 56.1 Statement.  That paragraph spans five pages and has ten paragraphs, each of which has between one and three subparts.  It thus is in technical violation of Local Civil Rule 56.1 which requires each "separate, short and concise statement" to be contained within its own numbered paragraph.  S.D.N.Y. Loc. Civ. R. 56.1(a).  But Defendant has demonstrated no prejudice.  The purpose of Local Civil Rule 56.1 is to permit the non-moving party simply to admit or deny each separate statement standing on its own and thus to facilitate a court's review of the summary judgment record.  That purpose thus is satisfied if each statement is in its own standalone paragraph, permitting the non-moving party either to admit or deny the statement and if denying the statement, to identify facts supporting its counterstatement.  That objective was satisfied here.  Although each statement is not in a "numbered" paragraph, it is in a standalone paragraph.  Plaintiff's Rule 56.1 Statement permits the Court to do its job in analyzing the summary judgment record and permits Defendant to

identify facts that it contends are in genuine dispute. It will not be stricken.[9] *See Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001) ("A district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules.").

Finally, Plaintiff cannot be faulted for including in its memorandum of law, *in haec verba*, the same factual assertions that are contained in the Rule 56.1 Statement. Defendant complains that both Plaintiff's Rule 56.1 Statement and memorandum of law contain assertions such as "[t]he disclosure schedule appended to the Purchase Agreement fails to include the Porter Wright Agreements, and McDevitt failed to disclose them" and "McDevitt did not disclose these threats to KLS." Dkt. No. 57 at 4. But this Court's Individual Practices in Civil Cases encouraged this practice by requiring that "the memorandum of law itself . . . must set forth all material facts in a fact section" and not just incorporate the Rule 56.1 Statement by reference. *See* Rule 3(D)(i) of this Court's Individual Practices in Civil Cases. The Court will not strike those statements.

**B.    Zarrilli Declaration**

Defendant also argues that the declaration of Michael Zarrilli in support of Plaintiff's motion for summary judgment should be stricken as it is not based on personal knowledge. *See* Dkt. No. 57 at 7-10. Federal Rule of Civil Procedure Rule 56(c)(4) requires that "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). Thus, for example, an assertion made "on information and belief" or a "hearsay assertion that would not be admissible at trial if

---

[9] In *Congregation Rabbinical College of Tartikov*, the court denied defendant's motion to strike plaintiffs' Rule 56.1 statement, even though it was 998 paragraphs long, supported by 11 declarations and 370 exhibits, included "redundant or incomprehensible facts," and contained improper legal conclusions. The court concluded that the appropriate outcome was not to strike the statement but simply to disregard the faulty sections. 138 F. Supp. 3d at 396-97.

testified to by the affiant" cannot be relied upon to support or contest summary judgment. *Patterson v. Cnty. of Oneida, N.Y.*, 375 F.3d 206, 219 (2d Cir. 2004); *see Sarno v. Douglas Elliman-Gibbons & Ives, Inc.*, 183 F.3d 155, 160 (2d Cir. 1999) (assertion by affiant as to what he was told was not competent evidence sufficient to defeat summary judgment).

Zarrilli was Chief Operating Officer of KLS at the time of the Transaction and remains in that position. In that capacity, he signed the Note Purchase Agreement on behalf of KLS. Dkt. No. 45-2. He also signed the Note and it was his email address to which Notices were to be sent by Sensei under the Note. Dkt. No. 45-1. He is also listed as the person to whom notice to KLS was required to be delivered under the Conditional Guaranty. Dkt. No. 45-3 ¶ 15. He makes his declaration "upon personal knowledge, except as otherwise noted." Dkt. No. 45-16 ¶ 2.

Certain of the assertions in Zarrilli's declaration are hearsay, such as the assertion that he has "seen communications in which [McDevitt] portrayed the process [of making an OIC to the IRS] as quick, easy, and virtually guaranteed to succeed," and that "[w]hen the KLS representatives who served on the Sensei board learned that, in fact, the OIC process could take a year or more, . . . they decided not to continue to pursue McDevitt's proposed OIC." *Id.* ¶ 13. They will be disregarded.

Other statements by Zarrilli, however, are based on personal knowledge. These statements include the statements that "[n]either [he], nor to [his] knowledge, KLS was aware of the Porter Wright Agreement until Porter Wright sued Sensei," *id.* ¶ 6, KLS did not know of the threat to sue Sensei prior to the closing of the Transaction, *id.* ¶ 7, "[n]either [he], nor to [his] knowledge, KLS was aware of the Finders Agreement until Jonathan Schwartz sued Sensei, obtained a judgment, and restrained Sensei's bank account, all of which was well after the closing of the Transaction," *id.* ¶ 9, and "KLS was not aware of the Schwartz lawsuit claiming

breach of the Finders Agreement until after Schwartz obtained a judgment and restrained

Sensei's accounts," *id.* ¶ 11.  Those statements will not be disregarded and, because they are not

controverted by admissible evidence, will be taken as true for purposes of summary judgment.

## II.     The Cross Motions for Summary Judgment

"A guaranty is 'the promise to answer for the payment of some debt or the performance

of some obligation, on default of such payment or performance, by a third person who is liable in

the first instance[.] It is an obligation to answer for the debt of another.'"  *Terwilliger v.*

*Terwilliger,* 206 F.3d 240, 246 (2d Cir. 2000) (citation omitted).  It is a "contract of secondary

liability," and "[a] guarantor will be required to make payment only when the primary obligor

has first defaulted."  *Id.*

Under New York law, in cases involving debt owed under guaranty obligations, "a

plaintiff establishes its *prima facie* entitlement to summary judgment by establishing the

execution of the agreements at issue and nonpayment thereunder."  *GCCFC 2006-GG7*

*Westheimer Mall, LLC v. Okun*, 2008 WL 3891257, at *2 (S.D.N.Y. 2008) (citation omitted); *see*

*also TD Bank, N.A. v. Clinton Ct. Dev., LLC*, 965 N.Y.S.2d 129, 132 (2d Dep't 2013) (plaintiff

established its prima facie entitlement to judgment "by presenting evidence of the existence of

the promissory notes and personal guarantees executed by each of the guarantors . . . and their

failure to make payment in accordance with the terms of those instruments").

"The interpretation of a guaranty is governed by the same principles that govern the

interpretation of other forms of contract."  *In re S. Side House, LLC*, 470 B.R. 659, 675 (Bankr.

E.D.N.Y. 2012) (citing *Gen. Phoenix Corp. v. Cabot*, 89 N.E.2d 238, 241 (1949)).  "A guaranty

is a contract, and in interpreting it we look first to the words the parties used."  *G3-Purves St.,*

*LLC v. Thomson Purves, LLC*, 953 N.Y.S.2d 109, 112 (2d Dep't 2012) (quoting *Louis Dreyfus*

*Energy Corp. v. MG Ref. & Mktg., Inc.*, 812 N.E.2d 936, 939 (2004)).  It also "must be read in

the context of the loan agreement which was executed contemporaneously." *Id.* "[T]he court should arrive at a construction which will give fair meaning to all of the language employed by the parties to reach a practical interpretation of the expressions of the parties so that their reasonable expectations will be realized." *Id.* (citation omitted).

"Under New York law, guarantee agreements must be strictly construed according to their terms." *Chase Manhattan Bank, N.A. v. Am. Nat. Bank & Trust Co. of Chi.*, 93 F.3d 1064, 1073 (2d Cir. 1996); *see also Ninety-Five Madison Co., L.P. v. Vitra Int'l AG*, 2020 WL 1503640, at *5 (S.D.N.Y. Mar. 30, 2020); *AXA Inv. Managers UK Ltd. v. Endeavor Cap. Mgmt. LLC*, 890 F. Supp. 2d 373, 380 (S.D.N.Y. 2012). Thus, "[a] guarantor's obligation must be 'narrowly construed and cannot be extended by construction beyond the plain and explicit language of the contract.'" *Chase Manhattan Bank*, 93 F.3d at 1073 (citation omitted). But what that means is that "a guaranty within the four corners of a specific contract should not be used to create perpetual indebtedness." *AXA Inv. Managers*, 890 F. Supp. 2d at 380; *see Citibank, N.A. v. Jacobsen*, 2020 WL 7046841, at *6 (S.D.N.Y. Dec. 1, 2020) ("[C]ourts must interpret guaranties *strictissimi juris*, meaning that courts must protect guaranties against liabilities that are not strictly within their terms."). At the same time, a "surety is not entitled to any particular tenderness in the interpretation of the language of his contract." *Compagnie Financiere CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 188 F.3d 31, 34 (2d Cir. 1999). A "written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms." *G3-Purves*, 953 N.Y.S.2d at 112 (citation omitted).

Plaintiff has established the existence of the Conditional Guaranty and non-payment. The only remaining question is whether Plaintiff has established the absence of a genuine fact issue that payment was due, i.e., that a Recourse Event has occurred.

Plaintiff argues that Recourse Events (a), (c), and (f) were triggered by events relating to the Porter Wright Agreements, the Finder's Agreement, and the failure to pay taxes, and that the occurrence of those Recourse Events triggers McDevitt's obligations under the Conditional Guaranty. These provisions, "when read in conjunction with the loan agreement entered into contemporaneously, operat[e] to define the terms and conditions of personal liability." *G3-Purves*, 953 N.Y.S.2d at 113.

Specifically, Plaintiff argues that there is no genuine issue of fact that McDevitt or Sensei: (1) made willful or intentional misrepresentations or omissions of material fact by failing to disclose the Porter Wright Agreements, the Finder's Agreement, and their related litigation, and made willful or intentional misrepresentations about the OIC process (Recourse Event (a)); (2) materially breached the Note by failing to promptly disclose the Porter Wright litigation and Schwartz litigation, by failing to timely file and pay taxes, and by permitting a lien to be filed against Sensei's assets by the Georgia Department of Revenue (Recourse Event (c)); and (3) incurred taxes, penalties, or interest that materially and adversely affected Sensei as caused by or known to McDevitt (Recourse Event (f)). Dkt. No. 43 at 1-2.

McDevitt's motion for summary judgment argues that no Recourse Events occurred and therefore there are no remaining obligations under the Conditional Guaranty because: (1) "the amounts owed to Porter Wright were minimal and McDevitt will be paying off all amounts owed by Sensei and McDevitt"; (2) McDevitt had a good-faith belief that Schwartz was not entitled to a finder's fee prior to closing the Transaction; (3) Plaintiff decided not to pursue the OIC to

resolve Sensei's tax obligations but rather loan Sensei $720,000 to pay the taxes; and

(4) Plaintiff's actions in foreclosing Sensei's assets have extinguished any further obligations of Sensei to Plaintiff and in turn McDevitt's liability under the Conditional Guaranty.  Dkt. No. 53 at 1.

The Court considers the motions together, in each case construing the evidence in the light most favorable to the non-moving party.

### A.       Recourse Events Related to Porter Wright

#### 1.       Porter Wright Agreements

There are genuine issues of material fact as to whether McDevitt made an intentional or willful misrepresentation in the Note Purchase Agreement by stating that it had disclosed all obligations of Sensei in excess of $50,000 without disclosing the Porter Wright Agreements.

Recourse Event (a) requires a finding that Sensei or McDevitt made an intentional or willful misrepresentation or intentionally or willfully failed to disclose a material fact in connection with the issuance of the Note or at any time that the Note is outstanding.  Although the omission trigger has a materiality qualifier, the misrepresentation trigger does not.

The Note Purchase Agreement contains a representation that, except for agreements mentioned in the attached Disclosure Schedule and "[e]xcept for the Transaction Agreements, there are not agreements, understandings, instruments or proposed transactions to which the Company is a party or by which it is bound that involve (i) obligations (contingent or otherwise) of, or payments to, the Company in excess of $50,000."  Dkt. No. 45-2 § 2.12(a).

Porter Wright had two agreements to provide services to Sensei at the time of the Transaction: an oral agreement as to which at least McDevitt was party and a written agreement to which Sensei was party.  Dkt. No. 59 ¶ 13.  Porter Wright issued two invoices to Sensei in the total amount of $35,307.04 for the written agreement in December 2014.  Dkt. No. 45-10, Ex. B.

Because the Note Purchase Agreement required the disclosure only of obligations in excess of $50,000, the written agreement did not have to be disclosed in the Transaction Documents and its omission does not render any of Sensei's statements in those documents to be misrepresentations.  Thus, there was no misrepresentation or actionable omission and Recourse Event (a) was not triggered.

Porter Wright was also owed $125,201.97 as of June 2014 in connection with services that it rendered to Sensei pursuant to an oral agreement.  However, the representation in the Note Purchase Agreement relates only to obligations of Sensei.  Unlike other representations in the Note Purchase Agreement that related as well to Sensei's officers and directors, the agreements representation did not relate to Sensei's officers and directors and did not require the disclosure of agreements as to which only McDevitt and not Sensei was an obligor.

There are genuine factual issues as to whether Sensei was an obligor under the oral Porter Wright agreement.  Plaintiff points to evidence that, in June 2018—long after the Transaction's closing—Porter Wright obtained a judgment against Sensei and McDevitt, jointly and severally for $152,196.51.  Dkt. No. 45-21.  But that judgment was based on the breach of a settlement agreement between Porter Wright, Sensei, and McDevitt, reached after the Transaction's closing and that required, in the event of a default, a payment from McDevitt and Sensei of $160,739.01, minus any payments already made by them.  Dkt. No. 45-18.  Moreover, the underlying claim in the Porter Wright complaint against McDevitt and Sensei alleged claims in quasi-contract against Sensei and not in contract with respect to the oral agreement.  The evidence thus is capable of the interpretation that Sensei was not a party to the oral contract at the time of the Transaction and only became liable in contract as a result of the settlement agreement.

In support of its argument, Plaintiff also points out that Sensei carried a $145,000 liability to Porter Wright in its internal files as an account payable before the Transaction and the same liability in the amount of $150,000 after the Transaction, Dkt. No. 55 at 21, and also points to correspondence on the closing date of the Transaction from Porter Wright to Sensei's CFO, Furer, that follows up on the "outstanding invoices from Porter Wright issued to Sensei and Sean McDevitt," Dkt. No. 60-2. But the internal files establish only that Sensei believed it had an obligation to Porter Wright to $145,000, not that it in fact had such an obligation. A contract, of course, requires a meeting of the minds and there is evidence that Porter Wright—the contractual counterparty—believed that its obligor was McDevitt and not Sensei directly.

The invoices are to the same effect. The email from Porter Wright to Furer includes a summary of the invoices: one set directed to Sensei for an amount below $50,000 and one set directed to McDevitt alone in an amount over $125,000. *Id.* Moreover, although Furer proposed to Porter Wright a payment plan that would have Sensei pay for the total amount (then due by both McDevitt and Sensei) of $160,739.01, that document does not establish the reasons why Sensei would be paying both sets of invoices—whether because it was liable to Porter Wright, in satisfaction of McDevitt's obligations to Porter Wright, or for some other reason.

Defendant submits a declaration from a partner at Porter Wright that states, based on Porter Wright's records, as of May 6, 2020, McDevitt "currently owes" Porter Wright $110,431.97 and that Sensei "currently owes" Porter Wright $35,307.04. Dkt. No. 51 ¶¶ 4-5. That declaration is based on the invoices that list McDevitt and Sensei as separate clients. *Id.*; Dkt. No. 51-1. The letters from Porter Wright addressed to McDevitt advised him, in one letter, that "you are indebted to Porter Wright, Morris & Arthur LLP in the sum of $125,431.97," and

in the other letter, that "Sensei, LLC is indebted to Porter Wright, Morris & Arthur LLP in the sum of $35,307.04."  Dkt. No. 45-10, Exs. C, E.

This evidence is sufficient to create a genuine issue of material fact.  Moreover, even if there were no genuine issue of fact that Sensei was obligated to Porter Wright at the time of the Transaction, Recourse Event (a) would only be triggered if Sensei and/or McDevitt made a willful or intentional misrepresentation in connection with the failure to disclose the oral agreement.  Based, in part, on the open questions with respect to the identity of the obligor under the oral agreement, the Court concludes there also are genuine issues of fact with respect to intent or willfulness.  *See Patrick v. LeFevre*, 745 F.2d 153, 159 (2d Cir. 1984) ("[W]here subjective issues regarding a litigant's state of mind, motive, sincerity or conscience are squarely implicated, summary judgment would appear to be inappropriate and a trial indispensable.").

## 2.      Threatened and Pending Porter Wright Litigation

There are no genuine issues of material fact that McDevitt made willful and intentional misrepresentations or omissions of material fact in connection with the failure to disclose the threatened and pending Porter Wright Litigation and that McDevitt caused a material breach of the material terms of the Note in causing Sensei to fail to promptly report that threatened and pending litigation.

Porter Wright's November 25, 2015 email to McDevitt about the unpaid Porter Wright bills threatened a lawsuit against Sensei with respect to those bills.  *See* Dkt. No. 45-11 (email from Porter Wright to McDevitt, stating "My firm wants to sue you personally and Sensei for payment. I've held them off thinking that is not the best approach for any of us. But if you don't communicate with me, I don't think there is any other choice. . . . If you do not respond to this email within the next 7 days, that will say it all").  McDevitt (to whom the email was sent) knew of the threatened lawsuit.  The threatened lawsuit was not disclosed at the time of the

Transaction.  McDevitt did not report that threat to Plaintiff, promptly or not.  Porter Wright made good on its threat in April 2017 when it commenced a lawsuit against both McDevitt and Sensei action seeking over $160,000 in payment.  The lawsuit was not disclosed to KLS at the time it was filed in April 2017 or even later in September 2017 when McDevitt entered into a settlement agreement with Porter Wright on behalf of himself and Sensei.  KLS learned about the legal difficulties with Porter Wright only in May 2018 after Porter Wright sued McDevitt and Sensei for breaching that settlement agreement and only when the filings were forwarded to Plaintiff by Sensei's new CEO, Reynolds.  Dkt. No. 45-20.  McDevitt admits that he did not inform Plaintiff of the litigation until June 2018.  Dkt. No. 59 ¶ 22.

McDevitt's conduct in connection with the Porter Wright litigation triggered two separate Recourse Events.  First, Sensei's failure to disclose Porter Wright's threatened lawsuit at the time of the Transaction triggered Recourse Event (a) because it rendered misleading the representation that, except for agreements mentioned in the attached Disclosure Schedule, "[t]here is no Action pending or to the Company's knowledge, currently threatened (i) against the Company or any officer, director or Key Employee of the Company."  Dkt. No. 45-2 § 2.9. The litigation representation, unlike the agreements representation, is not limited to litigation against Sensei.  It includes actions threatened against "Sensei" *or* "any officer, director, or key employee of Sensei."  *Id.*  Nor is it qualified by a $50,000 or other monetary threshold.  It states that only that there is "no" action threatened or pending against the officers or directors other than those referenced in the Disclosure Schedule, which did not disclose the Porter Wright threat. Dkt. No. 45-5.

The Court has little difficulty concluding that the threatened litigation would be material. *See Morgan Art Found. Ltd v. Brannan*, 2020 WL 469982, at *17 (S.D.N.Y. Jan. 28, 2020)

(while "the question of materiality is generally left to the fact finder," where "the evidence concerning the materiality is clear and substantially uncontradicted . . . the question is a matter of law for the court to decide"); *see* Restatement (Second) of Contracts § 241 (1981) ("In determining whether a failure to render or to offer performance is material, the following circumstances are significant . . . (a) the extent to which the injured party will be deprived of the benefit which he reasonably expected."); *see also Hadden v. Consol. Edison Co. of N.Y.*, 312 N.E.2d 445, 449 (1974).  Even if the threat were made against only Sensei for the amount it owed under the written agreement, the invoice required Sensei to pay $35,307.04 at the time of the Transaction, a substantial sum for a company McDevitt admits was "low on cash flow" and trying to find "a path toward profitability."  Dkt. No. 53 ¶ 2; *see also* Dkt. No. 60-2.  The threat also presented the possibility of unknown litigation costs to Sensei.

Defendant also offers no evidence to refute the conclusion that his failure to disclose Porter Wright's litigation was intentional or willful.  He admits the existence of the November 2015 email and offers no explanation as to why it was not disclosed to KLS before or at the time of the Transaction.  The Porter Wright email was not ambiguous.  It threatened litigation against both McDevitt and Sensei in no uncertain terms.  It also was directed to McDevitt and Sensei, and not to anyone else, and McDevitt himself was Sensei's signatory on the Note Purchase Agreement and the person making the representations.  Finally, the fact that Sensei disclosed in the Disclosure Schedule, and McDevitt must have thought about, threatened litigation in the amounts due to vendors of $25,000, $8,700, and $1,500, leads to the ineluctable conclusion that McDevitt's failure to disclosure the much larger sum as to which Porter Wright was threatening suit was intentional and willful.  *See* Dkt. No. 45-5 § 2.9.  Indeed, Sensei disclosed a settlement

agreement with a vendor, MentorMate, in the amount of $155,257.19, a sum similar to—but less than that—threatened by Porter Wright.  *Id.*

Moreover, even if McDevitt and Sensei's representations about threatened litigation were not intentionally and willfully false at the time of the Transaction, McDevitt's conduct in causing Sensei's failure to promptly disclose the Porter Wright litigation after it was filed breached a covenant in the Note and, in turn, gave rise to Recourse Event (c).

Recourse Event (c) is triggered when McDevitt has directly or indirectly caused "any material breach of the material terms of the Note."  Dkt. No. 45-3 § 1(c).  The use of the word "material" twice in Recourse Event (c) is telling.  The Recourse Event is addressed not only to breaches that "go to the root" of the Note as a whole, *see VFS Fin., Inc. v. Falcon Fifty LLC*, 17 F. Supp. 3d 372, 379-80 (S.D.N.Y. 2014) (defining a "material" breach as one that "go[es] to the root of the agreement between the parties") (quoting *Frank Felix Assocs., Ltd. v. Austin Drugs, Inc.*, 111 F.3d 284, 289 (2d Cir. 1997)), but also to those breaches that undermine or go to the root of any of the Note terms that are themselves material, in the sense of being "significant" or "essential," Black's Law Dictionary (11th ed. 2019) (also defining "material" as "[o]f such nature that knowledge of the item would affect a person's decision-making"); *see also* Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/material (last visited Dec. 15, 2020) ("[H]aving real importance or great consequences.").  Recourse Event (c) excludes breaches of Note terms that are themselves trivial, inconsequential, "slight, casual or technical," as immaterial breaches of material terms.  *WILJEFF, LLC v. United Realty Mgmt. Corp.*, 920 N.Y.S.2d 495, 497 (4th Dep't 2011) (citation omitted).

There can be little question that the affirmative covenant that Sensei must make "[a] prompt report of any legal actions pending or threatened in writing against the Company" is a

material term of the Note.  Dkt. No. 45-1 § 5(b)(vi).  It was one of several provisions in the Transaction agreements that was significant and went to the heart of the agreement between Sensei and Plaintiff.  Plaintiff exposed itself to significant risk to Sensei, in general, and to McDevitt, in particular, in connection with the purchase of the Note.  It extended a large credit to Sensei, a company that was failing, and put its faith in McDevitt, who was the CEO and Chairman of Sensei (and a person to whom Sensei was indebted).  *See* Dkt. No. 45-5 § 2.12(a)(3).  Plaintiff also bought for itself significant protection to mitigate against that risk.  One form of protection in the Note Purchase Agreement was the understanding that two KLS representatives would be on the Sensei board.  Another important set of protections, however, was the information rights that Sensei extended directly to Plaintiff in the Note itself, including the obligation of Sensei to deliver to Plaintiff monthly and annual financial statements, biannual operating budgets and financial projections, management updates, and "legal action notice."  *See* Dkt. No. 45-1 § 5(b)(vi).

Reflecting the importance of the legal action notice was the fact that the covenant was not subject to a materiality threshold.  Sensei was required to make a prompt report of "any" legal actions pending or threatened in writing against itself.  Another reflection of the importance of that affirmative covenant is the fact that the drafters of the Note made a breach of that provision, and of any of the other covenants, an Event of Default entitling Plaintiff—without more—to accelerate all principal and unpaid accrued interest and make the Note due and payable immediately, limiting any further risk to Plaintiff.  *See id.* § 7(b) (stating an Event of Default occurs when the "Company shall default in its performance of any covenant under this Note").[10]

---

[10] Indeed, the same conclusion follows from the language of the Conditional Guaranty itself which lists as among the material terms of the Note—the violation of which would give rise to Recourse Event (c)—the various negative covenants, including restrictions on indebtedness,

There is no genuine dispute that Sensei breached the affirmative covenant and that McDevitt caused that breach.  The Note requires Sensei to make a "prompt" report of actual or threatened legal action.  "Prompt" means "performed readily or immediately." Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/prompt (last visited Dec. 15, 2020); Oxford English Dictionary Online, https://www.oed.com/view/Entry/152488?isAdvanced=false&result=3&rskey=vX2RDD& (last visited Dec. 15, 2020) ("[R]eady, quick; done, performed, etc., without delay.").  In the context of litigation, "prompt" must mean shortly after Sensei became aware of the threatened or actual legal action.  It must mean, in a timeframe whereby the notice would be meaningful to Plaintiff and permit it to have involvement in the legal action.

McDevitt breached that material obligation.  As previously stated, McDevitt never reported the November 25, 2015 email from Porter Wright threatening him and Sensei with litigation.  McDevitt did not report to KLS when Porter Wright initiated litigation in April 2017 or when Porter Wright and McDevitt, individually and on behalf of Sensei, entered into a settlement agreement in September 2017.  McDevitt also did not tell Sensei of litigation related to breach of that settlement agreement until May 2018 when he forwarded an email to Reynolds, who immediately sent it to KLS, and McDevitt did not tell KLS of the litigation until June 2018. The litigation was notably absent from McDevitt's report to Sensei's board in December 2017. *See* Dkt. No. 45-17.  In sum, McDevitt failed to disclose the litigation to KLS until 14 months

---

liens, disposition of assets, distributions in respect of capital stock, payments of subordinated indebtedness, intellectual property, or affiliate transactions. Dkt. No. 45-3 § 1(c).  That list of material terms "include[es], without limitation" the negative covenants.  *Id.*  Based on that list, there is no reason to think that the contracting parties did not intend an affirmative covenant with respect to litigation to also constitute a material term of the Note.  Much like taking on indebtedness or a lien, being subject to a lawsuit can impose a future limitation on the ability of the target of the lawsuit to enjoy its assets.  The affirmative covenant was a material term.

after it was initiated and only after KLS learned of the lawsuit from someone else at Sensei the month before.

Finally, the breach of the covenant was material. The Porter Wright lawsuit did not seek de minimis damages, like some of the litigation or threatened litigation referenced in the Disclosure Schedule. It sought total damages of $160,000 against Sensei and McDevitt jointly and severally. The sum was 8% of the funds KLS advanced to Sensei and 16% of the funds allocated for Sensei to use for its working capital. Dkt. No. 45-5 § 2.33. It was larger than all but one of the items in the "Use of Proceeds" list in the Disclosure Schedule; it was larger than the next largest items: a $140,000 fee to Odeon, overdue payroll expenses of $116,000, and a $100,000 loan from Sensei to McDevitt personally. *Id.* And it was larger than any of the other pending or threatened litigation disclosed in the Disclosure Schedule. *Id.* § 2.9

The delay in McDevitt's reporting of the lawsuit to Plaintiff was also not immaterial or inconsequential. In the first place, the Porter Wright litigation asserted claims against both Sensei and McDevitt that McDevitt now asserts were the result of an obligation that McDevitt alone (and not Sensei) owed. On that account, Sensei would have both important defenses against Porter Wright as to the oral agreement and important crossclaims as against McDevitt. The delay alone from when the lawsuit was filed in April 2017 until when it was disclosed to KLS in the spring of 2018 had both the potential and effect of compromising those rights and the ability to timely assert them in the litigation. Particularly where, as here, the litigation was brought against both Sensei and McDevitt, and where the two obviously had differing interests, McDevitt's many month delay in reporting to KLS (whose interest was solely in Sensei) was hardly immaterial.

Moreover, as a matter of fact, from the time the lawsuit was filed in April 2017, until it was ultimately disclosed by McDevitt to Reynolds in May 2018 (and by McDevitt to KLS in June 2018), important events transpired and important decisions were made.  McDevitt had the opportunity to, and did, attempt to settle the litigation on behalf of himself and Sensei for a sum of $80,000, and then to breach that settlement agreement.  KLS bargained for the right to be informed of litigation so it could have a say in such decisions.  Instead, both the decision to agree to pay that $80,000 and to resolve the litigation, and the decision not to satisfy the agreement, were made entirely without KLS's knowledge or involvement, as a result of McDevitt's failure to disclose.

McDevitt argues that it was not a material breach to omit the Porter Wright litigation because "[o]nly if the judgment had been paid, thus actually depleting Sensei's financial resources, could Plaintiff even attempt to argue that a Recourse Event occurred" and Sensei never paid any portion of the judgment.  Dkt. No. 57 at 15-16.  He argues, in essence, either that no breach occurred or he should be relieved from the consequences of the breach under the Conditional Guaranty because he ultimately agreed to satisfy or will agree to satisfy the Porter Wright obligation.

There are two flaws with that argument.  First, as a matter of contract interpretation of the Note, KLS did not bargain just to be informed of a judgment rendered against Sensei *after* that judgment was rendered but also for the right to be informed of a litigation or threatened litigation *before* it resulted in a judgment or adverse consequences against Sensei and at a time that KLS could take actions to protect itself and Sensei.  That plainly did not happen here.  McDevitt's argument conflates the obligation to timely inform KLS of pending or threatened litigation with the consequences of the breach of that obligation.  The obligation arises when litigation is either

43

pending or threatened.  The breach occurs when the disclosure does not happen "promptly," and the Recourse Event is triggered as long as the breach is material, as measured at the time the breach occurs.  Indeed, taken to its logical conclusion, McDevitt's argument admits of the possibility that there could never be a material breach of the affirmative covenant to timely disclose a threatened or pending litigation for, under that argument, the obligation would not arise until *after* the litigation is concluded and would never be triggered for litigation that is resolved favorably.  It would also permit McDevitt to be able to forestall, for an indefinite period, the triggering of a Recourse Event by continuing to litigate and attempting to delay a resolution until McDevitt decided he wanted to disclose to KLS.  That plainly was not the intent of the parties.

Second, and equally fundamentally, McDevitt's argument misunderstands the nature of the obligation he undertook pursuant to the Conditional Guaranty.  That Conditional Guaranty was not limited to (and did not include) McDevitt's guarantee to bear the costs of any litigation and judgment against Sensei.  McDevitt guaranteed that, if he caused Sensei to materially breach a material term of the Note (which would permit KLS to accelerate the Note), he would pay any then remaining obligations of Sensei set forth in the Note, which included the *full* amount due under the Note.  The function of that provision, as KLS's counsel noted at oral argument, was to help ensure that Sensei would comply with those covenants and that KLS would enjoy the full benefits it had bargained for under the Note when it agreed to extend significant financing to Sensei.  McDevitt was the CEO, Chairman, and majority shareholder; he was in a position where, on the one hand, he could help ensure that Sensei complied with the covenants and, on the other hand, could cause Sensei to breach those obligations.  KLS wanted to ensure that he did not cause Sensei to breach the obligations.  It thus does not matter whether the litigation that

caused the material breach resulted in any damages to Sensei.  Neither the Note nor the
Conditional Guaranty contained a cure provision pursuant to which McDevitt—if he caused a
breach—could cure it and avoid a Recourse Event by paying the judgment.  Once the material
breach occurred, KLS had the right to accelerate the Note as an Event of Default and to proceed
against McDevitt for any then remaining obligations.  If McDevitt now believes that that result is
unfair and that he did not cause Sensei to default, his recourse—if any—is against Sensei.  The
answer is not to deprive KLS of the guarantee on which it relied in purchasing the Note.  Thus,
McDevitt's promise that he will pay the judgment, as evidenced by the fact that he "is currently
in negotiations with a Court-appointed receiver to collect the judgment solely from him," Dkt.
No. 57 at 16, does not immunize him from his obligations under the Conditional Guaranty.  *Cf.*
*G3-Purves*, 953 N.Y.S.2d at 112-14 (rejecting argument that guarantor should be relieved of
obligations it owed because "the full amount sought by the lender under the loan is vastly out of
proportion to the amount of the liens resulting in the borrower's defaults," and holding that "the
carve-out provisions were bargained for as part of the guaranty [and] . . . affected the value of the
collateral that secured the loan, as they afforded the lender the protection required by causing the
borrower and the guarantors to be personally liable, thus enabling the lender to look beyond the
mortgaged property for repayment of the loan").

The Court grants summary judgment in favor of Plaintiff with respect to Recourse Event
(c) concerning the threatened and pending Porter Wright litigation.

## B.   Recourse Events Related to the Finder's Agreement and the Schwartz Litigation

### 1.   Finder's Agreement

The Note Purchase Agreement required disclosure of all agreements involving
obligations in excess of $50,000, including contingent obligations.  *See* Dkt. No. 45-2 § 2.12(a).

"Contingent" is defined as "dependent on or conditioned by something else."  Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/contingent (last visited Dec. 15, 2020); *see* Oxford English Dictionary Online, https://www.oed.com/view/Entry/40248? redirectedFrom=contingent (last visited Dec. 15, 2020) ("Liable to happen or not; of uncertain occurrence or incidence," "Incidental (to)."); *see also* Black's Law Dictionary (11th ed. 2019) ("Possible; uncertain; unpredictable," "Dependent on something that might or might not happen in the future; conditional.").  The purpose is evident from the context: before investing $2 million in Sensei, KLS wanted to know what potential obligations Sensei would face in the future and to be able to judge for itself whether the contingencies would be realized.

The Finder's Agreement was a contingent obligation in excess of $50,000.  Sensei agreed to provide a 7% cash commission to Schwartz on an investment size of up to $2 million if an investor with whom Schwartz had a relationship invested in Sensei or, in the case of an investment banking entity with which he had a relationship, if that entity introduced other parties to Sensei who ultimately invested in Sensei.  Dkt. No. 45-22 § 3.  The Finder's Agreement provided that Schwartz would be paid only if at least $2 million was investment.  *See id.* ("Payments shall be made as the Investments are wired into the Sensei bank account, however, no fee shall be paid until the first $2,000,000 is invested.").  Therefore, if a finder's fee were to be paid at all, it would be a minimum amount of $140,000 (7% of $2 million).  Sensei's statement that it had no obligations (contingent or otherwise) in excess of $50,000 without disclosing the Finder's Agreement was a misrepresentation.

Though not necessary to the Court's conclusion, the misrepresentation (and omission) was material.  If the contingent Finder's Agreement occurred, Sensei would be required to pay at least $140,000—7% of KLS's investment in Sensei.  At least $1 million—or half of the $2

million investment—was already allocated to pay pre-existing debt obligations, which left only $1 million for operations.  Dkt. No. 45-5 § 2.33.  That meant that if the contingency occurred, 14% of proceeds earmarked for Sensei's operations would have to be spent on Schwartz.

McDevitt argues that he did not need to disclose the Finder's Agreement because he believed that the contingency that would have triggered Sensei's obligation had not occurred and would not occur.  He asserts that Zack had introduced McDevitt to Odeon in March 2016, Odeon introduced McDevitt to Plaintiff in July 2016, and that Schwartz was not a party to any of the communications between Plaintiff, Odeon, and Sensei.  Dkt. No. 53 at 19-20.  McDevitt asserts that he himself was not a party to any communications in March 2016 between Schwartz and Odeon to set up a meeting with Sensei, and that he was not aware of the connection between Schwartz and Odeon prior to the closing of the Transaction.  *Id.* at 20; *see* Dkt. No. 57 at 17. McDevitt further notes that on May 10, 2016, he, on behalf of Sensei, entered into an agreement with Odeon for Odeon to provide financial advisory and investment banking services—which was before the Finder's Agreement signed on September 12, 2016.  Dkt. No. 49-6.  McDevitt points to the Disclosure Schedule, which lists $140,000 owed to Odeon and $75,000 owed to Zack, to argue that those payments demonstrate that he thought Zack and Odeon had connected Sensei to Plaintiff, not Schwartz.  Dkt. No. 53 at 9; Dkt. No. 45-5 § 2.33.  Thus, he argues that Odeon—not Schwartz—introduced KLS and that Sensei would have no obligation to Schwartz. On that basis, he argues both that summary judgment should be denied as to KLS and granted in his favor.

Plaintiff disputes McDevitt's intent, arguing that McDevitt knew Schwartz connected Sensei with Odeon and knew of the contingent obligation under the Finder's Agreement, and therefore acted intentionally or willfully in not disclosing the agreement.  Plaintiff points to a

March 30, 2016 email that Schwartz sent to Zack and Zack forwarded to McDevitt in which Schwartz said, "have Sean [McDevitt] call Andrew Feldschreiber at Odeon Capital."  Dkt. No. 49-5.  It further highlights an August 17, 2016 email that discusses drafting the Finder's Agreement in which Schwartz says to McDevitt, cc'ing Zack, "As it seems now, Odeon will be orchestrating the deal, so I also added 'investment banking entity'" to the draft Finder's Agreement.  Dkt. No. 60-23.  McDevitt responded on August 30, 2016, saying "I am fine with 7% on the first $2mm, regardless of where it comes from. If an additional $4 or $5mm is raised through Odeon, a 7% cash fee on top of the fee I am paying Odeon is really rich."  *Id.*

McDevitt's assertions, taken as true, would not have relieved him and Sensei from disclosing the Finder's Agreement.  The Note Purchase Agreement required Sensei to disclose contingent obligations.  At the time of the closing, the Finder's Agreement was still in place. Regardless of whether the event that could trigger Sensei's obligation to pay Schwartz had occurred or would be likely to occur, the Finder's Agreement at that time imposed a contingent obligation on Sensei and thus had to be disclosed.  It was not up to McDevitt to decide for himself whether Sensei would have a $140,000 obligation to Schwartz.  KLS bargained for the right to be informed of any agreements that could—if a contingency occurred—result in an obligation on the part of Sensei so it could judge for itself whether the circumstances had or would occur and judge for itself whether—in light of that contingent obligation—it still wanted to purchase the Note and invest $2 million into Sensei.

As to McDevitt's intent or willfulness on this misrepresentation, however, the Court need not reach the question of whether the undisputed evidence supports a finding for KLS on this element because (1) the evidence does not support a judgment for McDevitt, and (2) regardless of whether Recourse Event (a) occurred with respect to the failure to disclose the Finder's

Agreement at the time of the Transaction, there is no genuine dispute that Recourse Event (c) occurred as a result of McDevitt and Sensei's failure to promptly disclose the Schwartz litigation.

2.      **Schwartz Litigation**

It is undisputed that McDevitt learned of the Schwartz litigation shortly after the complaint in that action was filed on June 2, 2017.  Sensei's counsel emailed McDevitt on June 8, 2017 with a copy of the complaint.  McDevitt did not report the litigation to KLS until November 10, 2017.  That report also stated that Sensei had been notified of the action in June 2017, when McDevitt was CEO and Chairman.  In the interim, the court in that action entered a default judgment in favor of Schwartz and against Sensei in the amount of $395,492.60 on September 27, 2017, and McDevitt learned on November 8, 2017 that Sensei's operating account had been reduced to a balance of $0 and its funds garnished.

"Prompt" reporting cannot mean reporting as soon as an adverse action is taken.  Nor can it mean reporting only after Sensei and McDevitt were properly served.  In the first instance, the reporting obligation extends not only to pending legal actions but also to threatened legal actions in writing—actions as to which there is no current filing and as to which, by definition, Sensei and McDevitt have not been served.  If McDevitt's interpretation were right, the reference to threatened actions and Sensei's obligation to report such actions would be meaningless and the rights for which KLS contracted would be rendered hollow.

Second, any alternative interpretation would defeat one of the purposes of prompt reporting—that KLS would know in advance of a potential adverse outcome or forestall it. Indeed, taken to its logical extension, McDevitt's argument would mean that Sensei would not have to report any litigation in which it was successful.  By any measure of "promptness,"

McDevitt and Sensei failed to report the litigation promptly, which was a material term of the Note, for the reasons already described in this opinion.

There is no genuine issue that McDevitt caused the breach of Sensei's affirmative covenant to report to Plaintiff. The undisputed evidence shows that McDevitt learned of the Schwartz litigation in early June 2017 and he did not report it until November 2017. He waited five months—almost one quarter of the term of the Note—to comply with the Note's affirmative covenant.

Finally, the breach was material. The Schwartz lawsuit sought damages of not less than $300,000, a full 15% of KLS's investment in Sensei, or 30% of the funds available for Sensei's working capital. The delay in reporting was not a mere few days or weeks; it was five months and it was consequential. The failure timely to investigate and answer a complaint has consequences. As here, it can lead to default. Indeed, the delay was such that a default judgment was entered against Sensei for $395,492.60 in November 2017. The lapse of time can also affect a defendant's ability both to defend itself and to proceed against others. It does not matter whether Sensei ever lost any defenses. The point of the covenant was to permit KLS to have input into whether there were defenses and how to assert them in a litigation that presented a material threat to its investment.

McDevitt attempts to excuse his failure to report the litigation by asserting that he did not think he needed to disclose the litigation because he believed that Schwartz did not properly serve McDevitt or Sensei with the complaint and because they never received notice that Schwartz would be seeking a default judgment against Sensei. Dkt. No. 53 at 20-21; Dkt. No. 57 at 17. There are at least two flaws in that argument.

First, neither Recourse Event (c) nor the affirmative covenant requires KLS to plead or prove intent or willfulness.  It is not a defense to the affirmative covenant that McDevitt did not think the litigation need be disclosed.  Nor is it a defense to Recourse Event (c).  Unlike Recourse Event (a), which requires a finding of intent or willfulness, in the case of Recourse Event (c), KLS bargained for and received the right to hold McDevitt liable on the guarantee regardless of whether he intentionally or willfully caused a breach of a Note covenant.  Under the doctrine of *expressio unius est exclusio alterius*, when a term is expressly included in a contractual provision, its exclusion from other provisions within the same contract reflects the parties' intent that the omission was intentional; such was the exclusion from Recourse Event (c).  *See Hardy v. N.Y.C. Health & Hosp. Corp.*, 164 F.3d 789, 794 (2d Cir. 1999) (describing "expressio unius est exclusio alterius" as the principle that "the mention of one thing implies the exclusion of the other"); *Matter of Trs. Established under the Pooling & Servicing Agreements relating to the Wachovia Bank Com. Mortg. Tr. Com. Mortg. Pass-Through Certificates, Series 2007-C30*, 375 F. Supp. 3d 441, 453 (S.D.N.Y. 2019) ("The Second Circuit has held that 'the presence of a phrase applicable to one factor makes clear that the phrase's omission elsewhere was deliberate.'") (quoting *United States v. Zukerman*, 897 F.3d 423, 431 (2d Cir. 2018), *cert. denied*, 139 S. Ct. 1262 (2019)); *see also Bank of N.Y. Mellon Tr. Co. v. Morgan Stanley Mortg. Cap., Inc.*, 821 F.3d 297, 306 (2d Cir. 2016) ("The failure to couch the request-for-cure provision in the explicit language of condition is particularly significant here because the sophisticated drafters elsewhere employed precisely such language."); *Novella v. Westchester Cnty.*, 661 F.3d 128, 142 (2d Cir. 2011) (finding that "the presence of [a] provision applicable to one type of pension makes clear that the omission of that provision in the [same contract] governing another type of plan was deliberate").

Second, and more fundamentally, McDevitt's argument rests on a wholly implausible and meritless reading of the affirmative covenant.  The affirmative covenant applies both to pending legal actions *and* to threatened legal actions.  A filed complaint that is not properly served is still "pending."  *See* Fed. R. Civ. P. 3 ("A civil action is commenced by filing a complaint with the court."); Charles A. Wright and Arthur R. Miller, 4 Fed. Prac. & Proc. Civ. § 1052 (4th ed. 2020) ("Filing a complaint requires nothing more than delivery of the document to a court officer authorized to receive it; the actual establishment of personal jurisdiction over the defendant, by service of process or other means, is not essential to the commencement of the action."); *see also United States ex rel. Wood v. Allergan, Inc.*, 899 F.3d 163, 172 (2d Cir. 2018) ("Legal proceedings are instituted by the origination of formal proceedings, such as the filing of an initial complaint.").  A pending action is one that is before a court but has not yet been decided.  And, even if an action were not pending, the sending of a complaint to McDevitt with an email that the lawsuit has been filed would constitute a threat.  Indeed, McDevitt's interpretation of the affirmative covenant would read the word "threatened" out of Sensei's obligations.  By his definition, only proper service of a complaint makes a lawsuit pending, and only such a lawsuit must be disclosed.  But, if that is so, then there would never be a threatened lawsuit that would have to be disclosed and Sensei's obligation would be rendered illusory.  *See Lantheus Med. Imaging, Inc. v. Zurich Am. Ins. Co.*, 255 F. Supp. 3d 443, 457 (S.D.N.Y. 2015), *aff'd*, 650 F. App'x 70 (2d Cir. 2016) ("New York courts 'will not adopt an interpretation that renders a contract illusory when it is clear that the parties intended to be bound thereby.'") (quoting *Blandford Land Clearing Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 698 N.Y.S.2d 237, 243 (1st Dep't 1999)); *see also Shaw Grp. Inc. v. Triplefine Int'l Corp.*, 322 F.3d 115, 124 (2d Cir. 2003) ("An interpretation of a contract that has the effect of rendering at least one clause

superfluous or meaningless . . . is not preferred and will be avoided if possible.") (citation omitted).

McDevitt also argues that the breach was not material because he ultimately agreed to satisfy Sensei's obligation, the default judgment was improperly obtained, and the default judgment was lifted.  Dkt. No. 57 at 17; Dkt. No. 53 at 20.  Relatedly, he argues that "the disruption that was caused to Sensei and the legal fees expended to vacate the default judgment are solely attributable to Mr. Schwartz's deliberate misrepresentations to this Honorable Court, not to any wrongdoing by Mr. McDevitt."  Dkt. No. 57 at 17; *see* Dkt. No. 53 at 21.

McDevitt's arguments fall prey to the same flaw as with the Porter Wright litigation.  The affirmative covenant to promptly report litigation was not limited to litigation that turned out to be meritorious or that required Sensei to make payments or impaired the ability of Sensei to operate as a going concern.  A separate Recourse Event, Recourse Event (b), addressed gross negligence on the part of Sensei or McDevitt that "could materially and adversely affect Company, the Company's prospects or the prospects of repayment of the Note."  Dkt. No. 45-3 § 1(b).  The parties clearly knew how to limit an affirmative covenant or a Recourse Event to actions that could materially or adversely affect Sensei's ability to repay the Note.  *See Quadrant Structured Prod. Co. v. Vertin*, 16 N.E.3d 1165, 1172 (2014) ("If parties to a contract omit terms . . . the inescapable conclusion is that the parties intended the omission.").  The affirmative covenant to promptly report pending or threatened legal actions was intended to do something else.  It was intended to give KLS—which had extended substantial sums to Sensei—information for planning, to mitigate its risk, and to permit KLS—if Sensei failed to provide it with such information—to accelerate the Note and eliminate continuing risk.

The Court grants summary judgment in favor of Plaintiff with respect to Recourse Event (c) concerning the Schwartz litigation.

### C.      Failure to Timely File and Pay Taxes

Plaintiff argues that Recourse Events (a), (c), and (f) were triggered in connection with McDevitt's misrepresentations and actions regarding Sensei's taxes.  The Court grants Plaintiff's motion for summary judgment with respect to Recourse Event (c), specifically McDevitt's breach of the Note's affirmative covenant to timely file and pay taxes.  The Court accordingly need not and does not reach the question whether Plaintiff is entitled to summary judgment with respect to Recourse Events (a) and (f).

Under the Note, Sensei agreed to the affirmative covenant to "[t]imely file all required tax returns and reports and timely pay all foreign, federal, state and local taxes, assessments, deposits and contributions owed by Company."  Dkt. No. 45-1 § 5(c).  Plaintiff claims that McDevitt caused Sensei to materially breach this affirmative covenant when Sensei failed to timely pay its state and federal taxes in 2018.  Specifically, Plaintiff points to Sensei's failure to timely file and pay its federal taxes for the first and second quarters of 2018, which resulted in thousands of dollars of penalties for Sensei.  In addition, between January 1, 2018 and May 25, 2018, Sensei made no tax payments and owed money to California, Georgia, and Texas state tax authorities.  McDevitt was Chairman and CEO of Sensei through May 17, 2018 and Chairman through October 25, 2018; after his removal as CEO, he also agreed to continue to work with JMPC to facilitate resolution of Sensei's tax obligations.  There is no genuine dispute that in his capacities as CEO and as Chairman, McDevitt caused Sensei's failure to timely file and pay taxes.

The Note covenant required the "timely" filing and payment of taxes.  This affirmative covenant was a material term of the Note.  The Note was negotiated and purchased against a

backdrop of Sensei having failed to pay taxes in the past and having promised that it would timely file and pay them in the future.  Sensei specifically represented in the Note Purchase Agreement that, with the exception of items listed in Section 2.19 of the Disclosure Schedule, "[t]here are no federal, state, county, local or foreign taxes due and payable by the Company which have not been timely paid" and that "[t]he Company has duly and timely filed all federal, state, county, local and foreign tax returns required to have been filed by it."  Dkt. No. 45-2 § 2.19.  The Note then required Sensei to maintain this status quo by agreeing to "timely" file and pay its taxes.  Dkt. No. 45-1 § 5(c).  Any failure to timely file, as well as to timely pay, constituted an Event of Default and permitted KLS to accelerate the Note and require Sensei to repay KLS its investment with interest.  *Id.* § 7(b).  Moreover, as with the affirmative covenant to make a prompt report of "any" threatened or pending litigation, the affirmative covenant that Sensei timely file and pay its taxes was not subject to a materiality threshold.

The obligation to "timely" file and pay taxes required Sensei to meet all applicable deadlines both with respect to filing and with respect to payment.  *See* Black's Law Dictionary (11th ed. 2019) ("Within a specified deadline."); Merriam-Webster Online Dictionary, https:// www.merriam-webster.com/dictionary/timely (last visited Dec. 15, 2020) ("[C]oming early or at the right time."); Oxford English Dictionary Online, https://www.oed.com/view/Entry/202120? rskey=Blh76u&result=1&isAdvanced=false#eid (last visited Dec. 15, 2020) ("Done or occurring sufficiently early or in good time; prompt.").  There is no genuine issue of material fact that Sensei failed to satisfy this covenant.  Sensei filed its tax return for the first quarter of 2018 on July 23, 2018, almost one month after the deadline of June 27, 2018, and also failed to pay the full amount due, $31,597.28, by that deadline.  Dkt. No. 45-31 at 72-73.  It incurred penalties for these actions that it did not pay off until February 21, 2019.  *Id.*  In addition, Sensei made no

payments towards state taxes between January 1, 2018 and May 25, 2018 that became due after the Transaction.  Dkt. No. 45-34.  Indeed, McDevitt does not argue that the tax returns, reports, and taxes were not filed or paid "timely" or dispute that these tax liabilities are at issue.

McDevitt argues that the late filings and fees were not "directly or indirectly caused by" him.  Dkt. No. 45-3 § 1(c).  That argument is based on the contention that the federal tax liabilities in the first quarter of 2018 would have been settled by the OIC that McDevitt, along with his tax advisors, submitted to the IRS in November 2018 but because KLS decided to "simply pay off Sensei's tax liability in full, against the advice of Sensei CEO Ashley Reynolds and Chairman of the Sensei Board, Patrick Cua," KLS stopped the OIC process.  Dkt. No. 57 at 19; *see also* Dkt. No. 53 at 24-25.  McDevitt argues that he deposited over $165,000 in Sensei's bank account between June and July 2018 in order to help personally pay Sensei's taxes and also negotiated certain state taxes.  Dkt. No. at 26.

That argument misunderstands the obligation imposed by the affirmative covenant.  The affirmative covenant required Sensei to timely file and pay taxes.  The breach of the affirmative covenant thus occurred when Sensei failed to timely file the tax returns in 2018 and also failed to timely pay the taxes associated with those returns.  It did not address the settlement of tax liabilities already incurred by the failure to timely pay or contain a loophole that would excuse the failure to timely file or pay if McDevitt was able to settle with the IRS or contributed his own funds to satisfying Sensei's tax liabilities.  Thus, whether McDevitt attempted to later reduce those liabilities through the OIC process or by personal payments, or KLS paid the full amount of the liabilities is irrelevant to whether a breach occurred.  Nor is it relevant to whether the breach was material.  The time for measuring materiality would have been when the breach occurred.

The breach was material.  McDevitt claims, in essence, that KLS manufactured its own materiality by paying far more than was necessary to satisfy the IRS.  But that argument rests on an implausible and counterintuitive notion that KLS—which had a direct claim against Sensei under the Note and expected repayment of the loan—would cause Sensei knowingly to waste or dissipate Sensei's assets.  There is no evidence to support that contention.

Moreover, even if one were to credit McDevitt's arguments that his strategy, rather than the strategy Sensei adopted after his departure, was the right one, the failure timely to file and pay was material.  The amount of the liability was significant.  So too were the consequences of failure to timely file and pay.  For the first quarter of 2018, the IRS assessed against Sensei a total of $5,499 in late fees, penalties, and interest: $2,287 fee for late filing of the tax return, a $254 penalty for late payment of the tax, $399 of interest for the late payment, and $2,559 in related penalties.  Dkt. No. 45-31 at 72-73.  Sensei also owed at least $4,251 in state taxes by the end of 2018.  Dkt. No. 45-34.  Altogether, Sensei owed $9,750 to the IRS for just the first quarter of 2018 and to state tax authorities for 2018—a substantial amount for a company that, by November 2018, had only roughly $16,000 in cash in its accounts and that still owed amounts to various tax authorities for prior tax periods.  Dkt. No. 53 at 23; Dkt. No. 45-51.  Nor was the OIC process, which had been negotiated for over a year, certain to resolve these overdue taxes and penalties.[11]  The consequence of this material breach was that KLS had to loan its own money to

---

[11] At her deposition, JMPC tax advisor Ravindranathan stated that even once the OIC was submitted to the IRS, it would take an additional two months to receive confirmation of its receipt and then an additional four to six months after that letter to connect with the IRS examiner assigned to the case.  Dkt. No. 48-5 at 12:7-23.  Given that the OIC was submitted in November 2018 (and Plaintiff disputes that it was submitted properly), it would take until at least May or July 2019 for Sensei to speak with an IRS examiner about the OIC or, in best case scenario, receive an acceptance letter.  And even if such an offer is accepted, Sensei would likely be required to comply with other terms of the OIC for the next five years, including to pay tax returns and payments on time.  *Id.* at 18:14-19:6.

Sensei to cover these and other liabilities, thus leading KLS to pay for liabilities that Sensei and McDevitt had promised not to create. The breach exposed Sensei to significant risk and required a significant expenditure of time and effort. It does not matter if Sensei paid more than it would have paid had McDevitt stayed in control (an assertion that is dubious). Even under McDevitt's approach, the risk and the liability were substantial.

### D.   KLS Foreclosure

Finally, McDevitt relies on two provisions of the Note to argue that, regardless of whether a Recourse Event was triggered, KLS's foreclosure on Sensei's assets means that there are no remaining obligations of Sensei for which McDevitt can be held liable. Because Section 4 of the Note says the collateral is given to KLS "to secure the payment and performance in full of all the Obligations," McDevitt argues that once KLS is granted the collateral, Sensei has "performed all of its obligations under the Promissory Note 'in full' and no further obligations remain." Dkt. No. 53 at 27-28. He then argues that, once these obligations are fulfilled, under Section 7 of the Conditional Guaranty he would have continuing liability *only if* either payment or performance of Sensei's obligations is avoided or recovered from KLS, or KLS is required to restore or return such payment or performance in connection with bankruptcy, insolvency, or reorganization of Sensei or otherwise. *Id.*

McDevitt's argument rests on a misunderstanding of the Note and the Conditional Guaranty and would render meaningless important rights granted to KLS under the Conditional Guaranty. The Conditional Guaranty gave KLS the right, "[u]pon a default of [Sensei] under the Note," to proceed against Sensei, McDevitt, or both, and provided that KLS "may elect to exercise any remedy against [Sensei] or any collateral or any guarantor or other person" and "[n]o such action by [KLS] will release or limit the liability of Guarantor [i.e., McDevitt]." Dkt. No. 45-3 § 6.1. One of the important remedies KLS had against Sensei in the event of a default

was the right to foreclose against Sensei's collateral, defined as personal property of Sensei, whether now owned or hereafter acquired, including all contracts, intellectual property, goods, equipment, inventory, and fixtures, and money.  *See* Dkt. No. 45-1 §§ 4, 7-8.  Sensei granted to KLS "a continuing security interest in, and pledge[d] to [KLS], the Collateral" in order "to secure the payment and performance in full of all of the Obligations," *id.* § 4, with Obligations defined to mean KLS's obligations "to pay when due any principal, interest, Make-Whole premium, fees, [KLS] Expenses, and other amounts due pursuant to this Note," *id.* § 15.

KLS's remedies against Sensei in the event of a default were not in derogation of, but were in addition to, KLS's remedies against McDevitt under the Conditional Guaranty.  Under that agreement, McDevitt is "fully and personally liable for the payment and performance of any then remaining obligations of Company set forth in the Note (collectively, the 'Guaranteed Obligations') only in the event" of a Recourse Event.  Dkt. No. 45-3 § 1.  Contrary to McDevitt's interpretation of Section 7 of the Conditional Guaranty, that section does not limit McDevitt's liability but rather provides for its "continuance."  *Id.* § 7.  Section 7 states that McDevitt's liability "shall continue in effect notwithstanding any payment or performance of the Guaranteed Obligations by [Sensei] such that, if any such payment or performance is avoided or recovered from [KLS] or [KLS] is otherwise required to restore or return any such payment or performance in connection with the bankruptcy, insolvency or reorganization of [Sensei] or otherwise, [McDevitt] shall remain liable hereunder as though such payment or performance had not occurred."  *Id.*  It does not say that McDevitt's liability continues only if those situations occur; it says that his liability continues despite their occurrence.

Thus, reading the documents together, and in particular reading Section 6.1 of the Conditional Guaranty, KLS's exercise of its rights against Sensei did not compromise its rights

against McDevitt or "release or limit the liability of Guarantor." *Id.* § 6.1.  If the Collateral was insufficient, McDevitt would pay for "any then remaining obligations" under the Note.  That interpretation comports with KLS's public notice of the foreclosure sale in which it attempted to sell the Collateral "in order to satisfy the Debtor [defined as Sensei] to the Secured Party [defined KLS]."  Dkt. No. 48-1.

## CONCLUSION

Plaintiff's motion for summary judgment is GRANTED.  Dkt. No. 42.  Defendant's motion for summary judgment is DENIED.  Dkt. No. 39.

The parties are directed to appear for a telephonic conference on December 28, 2020 at 11:00 a.m.  Parties should dial into the Court's teleconference line at 888-251-2909, Access Code 2123101, and follow the necessary prompts.

SO ORDERED.

Dated: December 15, 2020
       New York, New York                          _____
                                                          LEWIS J. LIMAN
                                                     United States District Judge