UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------------X
                                                :

KLS DIVERSIFIED MASTER FUND, L.P.,       :

                                   :

                     Plaintiff,    :

                                   :          19-cv-3774 (LJL)

        -v-                        :

                                   :       OPINION AND ORDER

SEAN MCDEVITT,                       :

                                 :

                    Defendant.    :

                                   :
---------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:__4/2/2021__

LEWIS J. LIMAN, United States District Judge:

      Plaintiff KLS Diversified Master Fund, L.P. ("Plaintiff" or "KLS") moves, pursuant to

Fed. R. Civ. P. 56, for summary judgment on the amount of damages, including attorney's fees

and costs.  Dkt. No. 83.  For the following reasons, the motion is granted in part and denied in

part.  Plaintiff is directed to submit a proposed judgment in accordance with this Opinion after

which final judgment will be entered.

## BACKGROUND

      The facts of this case have been summarized in the Court's prior opinion granting

summary judgment to Plaintiff on the issue of liability.  Dkt. No. 73; *KLS Diversified Master*

*Fund, L.P. v. McDevitt*, 2020 WL 7360658 (S.D.N.Y. Dec. 15, 2020).  The Court assumes

familiarity with that opinion and adopts the terms defined therein unless otherwise stated.

      The following facts relevant to damages and the amount of judgment are taken from the

parties' respective Rule 56.1 statements and are undisputed.

### A.      The Note and The Guaranty

      On January 9, 2017, Defendant Sean McDevitt ("Defendant" or "McDevitt") signed a

Conditional Guaranty (the "Guaranty"), guaranteeing the obligations of non-party Sensei, Inc.

("Sensei") on a promissory note (the "Note") executed the same day.  Pursuant to Section 1 of the Guaranty, McDevitt agreed that he would "be fully and personally liable for the payment and performance of any then remaining obligations of [Sensei] set forth in the Note" but only upon the occurrence of any one of six "Recourse Events" set forth in the Note.  Dkt. No. 45-3 § 1. The Note obligated Sensei to repay the principal sum of $3.33 million it had borrowed from KLS at a 4% annual interest rate compounded quarterly at the earliest of: (1) the two-year anniversary of the issue date of the Note (i.e., January 9, 2019), (2) upon a company sale, or (3) upon the automatic acceleration of the Note as a result of an "Insolvency Event."  Dkt. No. 45-1 § 2. Sensei did not repay the Note on January 9, 2019, and no payments of interest have been made on it.

KLS brought this action to recover on the Guaranty.  By Opinion and Order dated December 15, 2020, the Court granted Plaintiff's motion for summary judgment and denied Defendant's motion for summary judgment.  The Court concluded, based on the undisputed facts, that several Recourse Events had occurred and McDevitt was liable to KLS under the Guaranty.  KLS did not seek summary judgment as to damages and the Court therefore left open the amount KLS was owed under the Guaranty.

## B.    The Collateral

Under the Note, Sensei granted KLS a security interest in certain of its personal property, including all intellectual property of Sensei (the "Collateral").  *Id.* § 4.  Section 4 of the Note reflected that: "The security interest granted herein is and shall at all times continue to be a first priority perfected security interest in the Collateral (subject only to Permitted Liens). [Sensei] hereby authorizes [KLS] to file financing statements with all appropriate jurisdictions to perfect or protect [KLS]'s interest or rights hereunder and take such other steps as [KLS] deems appropriate to perfect and protect the security interest granted pursuant hereto."  *Id.*  Upon an

Event of Default, KLS was granted the authority "without notice or demand, [to] exercise all rights and remedies of a secured party under the UCC," including to "do any acts it considers necessary or reasonable to protect the Collateral and/or its security interest in the Collateral." *Id.* § 8.

Upon Sensei's failure to repay the principal amount to KLS under the Note, KLS foreclosed on all of Sensei's assets, including its intellectual property. Dkt. No. 48-1, Ex. 11 to Ex. A. The Notice of Foreclosure, pursuant to Section 9-610 of the Delaware Uniform Commercial Code ("UCC"), reflected that, on February 14, 2019, KLS would sell at public auction all of Sensei's personal property, including intellectual property, in satisfaction of Sensei's indebtedness to KLS, and it reserved all of KLS's rights against Sensei "for any and all deficiencies on the indebtedness remaining due to [KLS] after the sale." *Id.*

It is not disputed that the Collateral has not been sold by KLS. McDevitt has offered evidence, however, that, at least at one point in time, KLS attempted to market the assets to a buyer known as the Kaviva Acquisition Group for a price of $2.2 million. Dkt. No. 94 ¶ 15; Dkt. No. 48-1, Ex. 12 to Ex. A at 299:17-301:24. To date, however, KLS has received nothing of value for the Collateral. *See* Dkt. No. 94 ¶ 15.

On November 14, 2018, McDevitt signed an IRS Form 433-B ("Offer in Compromise" or "OIC") to be filed with the IRS. Dkt. No. 45-51. The OIC listed $16,351.88 in a bank account as Sensei's only asset; it did not list Sensei's intellectual property. *Id.*; Dkt. No. 88 ¶ 20; Dkt. No. 48, Ex. C at 50:9-51:11, 118:15-119:20. The OIC was filed with the IRS on November 28, 2018. Dkt. No. 88 ¶ 16.

## LEGAL STANDARDS

Summary judgment is appropriate when the record shows that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R.

Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "An issue of fact is 'material' for these purposes if it 'might affect the outcome of the suit under the governing law,'" while "[a]n issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Konikoff v. Prudential Ins. Co. of Am.*, 234 F.3d 92, 97 (2d Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  In determining whether there are any genuine issues of material fact, the Court must view all facts "in the light most favorable to the non-moving party," *Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008), and the movant bears the burden of demonstrating that "there is no genuine dispute as to any material fact," Fed. R. Civ. P. 56(a).

If the movant meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008).  It may not rely on "mere speculation or conjecture as to the true nature of the facts," *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted), or "on the allegations in [its] pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible," *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (internal citation omitted).  Rather, to survive a summary judgment motion, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record," Fed. R. Civ. P. 56(c)(1)(A), and demonstrating more than "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).  If "the party opposing summary judgment propounds a reasonable conflicting interpretation of a material disputed fact," summary judgment shall be denied.  *Schering Corp. v. Home Ins. Co.*, 712 F.2d 4, 9-10 (2d Cir. 1983).

**DISCUSSION**

Plaintiff seeks summary judgment on the amount it is owed under the Guaranty.  It contends that, based on the undisputed facts, McDevitt is liable for the full principal amount on the Note of $3,330,000, plus interest due and owing of $583,752.042 as of January 9, 2021, for a total of $3,913,752.04 as of January 9, 2021.  It calculates daily interest after January 9, 2021 as $434.43 per day.  It also seeks attorney's fees and costs of $1,174,125.60, or adding "fees on fees," total attorney's fees and costs of $1,677,322.29.

McDevitt argues that the amount of the judgment against him should be reduced by the value of the Collateral in KLS's possession.  He also claims that interest is due under the Note only up until the date of maturity, and that no interest is due thereafter.  Finally, he challenges attorney's fees and costs.  The Court discusses each issue in turn.

A.      **Principal Amount of the Note and Collateral**

Plaintiff argues that under the plain language of the Guaranty, it is entitled to a judgment of the amount due from Sensei of principal and of unpaid accrued interest at the contractual rate until the date of judgment.  It relies on Section 1 of the Guaranty, pursuant to which, as noted, McDevitt agreed that he would "be fully and personally liable for the payment and performance of any then remaining obligations of the Company set forth in the Note."  Dkt. No. 45-3 § 1.

McDevitt first argues that the amount of the judgment should be reduced by the value of Collateral posted by Sensei and foreclosed upon by KLS to secure Sensei's obligations under the Note.  He asserts that the Collateral is worth $2.6 million based on a business valuation done of Sensei's liquidation value by a third-party two years ago.  *See* Dkt. No. 87 at 5-6; Dkt. No. 84, Ex. A.  In essence, McDevitt asks the Court to hold a trial on the value of the Collateral and to reduce the judgment based on whatever the Court determines to be that value, whether or not it is realized by KLS.  Second, McDevitt does not dispute the amounts due and owing under the Note

at least through the date of default or the requirements of the UCC, but he argues, however, that his obligation should be reduced by the value of the Collateral based on: (1) language in this Court's December 15, 2020 Opinion and Order that stated "if the Collateral was insufficient, McDevitt would pay for any then remaining obligations under the Note," *KLS Diversified*, 2020 WL 7360658, at *29; and (2) language in the Guaranty and in the Note that McDevitt contends creates an ambiguity as to whether the value of the Collateral should offset McDevitt's liability under the Guaranty.  McDevitt is wrong on all counts.

As to McDevitt's first argument, "[i]n law the principal distinction between an unconditional guaranty (sometimes called 'guaranty of payment') and a conditional guaranty (sometimes called a 'guaranty of collection') is that, under the former, no duty is imposed on the creditor to attempt to collect from the primary obligor prior to attempting to collect from the guarantor.  Under a conditional guaranty, on the other hand, the creditor is first required to use reasonable diligence to collect from the primary obligor before looking to the assets of the guarantor."  Secured Transactions Guide ¶ 54,519, 1986 WL 1347581 (1986) (quoting *Peck v. Mack Trucks, Inc.*, 704 S.W.2d 583, 585 (Tex. App. 1986), *abrogated on other grounds by Greathouse v. Charter Nat. Bank-Sw.*, 851 S.W.2d 173 (Tex. 1992)); *see also Gen. Elec. Cap. Corp. v. Anderson*, 2015 WL 575159, at *5 (D. Conn. Feb. 11, 2015) ("D]istinguishing between these [terms] lies primarily with the difference in the creditor's duty to proceed against the principal obligor before attempting to collect from the guarantor.") (quoting *United States v. Willis*, 593 F.2d 247, 254 (6th Cir. 1979)).

The Guaranty falls into this former category.  Notwithstanding the instrument's title of "Conditional Guaranty," the plain language of its terms reflects that once a Recourse Event occurred (which was the "condition"), McDevitt's obligations were unconditional.  Section 3 of

6

the Guaranty says that it is a "guaranty of payment and performance and not of collectability"

and that "[KLS] may bring a separate action against Guarantor without proceeding against

[Sensei] or any other guarantor or other person or any security held by [KLS], and without

pursuing any other remedy."  Dkt. No. 45-3 § 3.  "New York State courts have long recognized

that when a party guarantees payment of a debt, as opposed to collection of a debt, the guaranty

is absolute and unconditional."  *AXA Inv. Managers UK Ltd. v. Endeavor Cap. Mgmt. LLC*, 890

F. Supp. 2d 373, 384 (S.D.N.Y. 2012) (quoting *In re S. Side House, LLC*, 470 B.R. 659, 675

(Bankr. E.D.N.Y. 2012) (citing, inter alia, *McMurray v. Noyes*, 72 N.Y. 523, 524-25 (1878)

(distinguishing a guaranty of payment, which allows a creditor to seek indemnification directly

from the guarantor, from a guaranty of collection, which allows a creditor to proceed against the

guarantor only after having pursued collection from the principal debtor via legal proceedings)).

Section 7 of the Guaranty confirms that it is a "continuing" guaranty of payment and thus an

unconditional guaranty: "The liability of Guarantor hereunder shall continue in effect

notwithstanding any payment or performance of the Guaranteed Obligations by [Sensei]."  Dkt.

No. 45-3 § 7; *see, e.g.*, *United Bank of Afr., P.L.C. N.Y. Branch v. Odimayo*, 1994 WL 185826,

at *1 (S.D.N.Y. May 10, 1994) ("This Guaranty shall be construed as a continuing, absolute, and

unconditional guaranty of payment . . ."); *Citicorp Leasing, Inc. v. United Am. Funding, Inc.*,

2005 WL 1847300, at *1 (S.D.N.Y. Aug. 5, 2005) (defendants' obligations are fixed

"unconditionally, absolutely, and irrevocably . . . irrespective of . . . the genuineness, validity or

enforceability of [the Loan Agreements]").

  Numerous other provisions of the Guaranty are consistent with the reading that the

Guaranty is a "guaranty of payment" and thus McDevitt's obligation (once triggered) was

unconditional.  Consequently, KLS has no duty to collect on or sell the Collateral before

attempting to collect from McDevitt.  Section 2.1 of the Guaranty gives KLS the right, without obtaining McDevitt's approval, to fail to perfect, terminate, compromise, or release the Collateral.  Dkt. No. 45-3 § 2.1(c).  Under Section 4.1 of the Guaranty, McDevitt waived and agreed not to assert "any right to require [KLS] to proceed against [Sensei], any other guarantor or any other person or any security now or hereafter held by [KLS], or to pursue any other remedy whatsoever."  *Id.* § 4.1(a).  He also agreed to waive:

> [A]ny right to designate the order of application of any sums or property received by [KLS], and in connection therewith [McDevitt] agree[d] that any amounts received by [KLS] from any source on account of the Guaranteed Obligations may be applied by [KLS] toward payment thereof in such order as [KLS] may from time to time elect (including application thereof first to payment or discharge of portions of the Guaranteed Obligations for which [McDevitt] is not liable under th[e] Guaranty, if any, prior to any application thereof to the Guaranteed Obligations for which [McDevitt] is liable under th[e] Guaranty), notwithstanding any contrary designation by [Sensei], [McDevitt] or any other person.

*Id.* § 4.1(l).  Under Section 6.1, McDevitt granted KLS the right, "[u]pon a default of [Sensei] under the Note, [to] elect to exercise any remedy against [Sensei] or any collateral or any guarantor or other person" and agreed that:

> No such action by [KLS] will release or limit the liability of [McDevitt], even if the effect of that action is to deprive [McDevitt] of the right or ability to collect reimbursement from or assert subrogation, indemnity or contribution rights against [Sensei] or any other guarantor or other person for any sums paid to [KLS], or to obtain reimbursement by means of any security held by [KLS] for the Guaranteed Obligations.

*Id.* § 6.1. Section 9 provides that the remedies of KLS "against [Sensei], [McDevitt] and any other person are cumulative."  *Id.* § 9.

The meaning of these provisions is clear and unambiguous.  Upon a default by Sensei and the occurrence of a Recourse Event, McDevitt had an obligation to pay to KLS the full amount due and owing and KLS had the right to pursue McDevitt for that amount and hold him to his obligation without proceeding against Sensei "or any security held by [KLS]."  *Id.* § 3.

McDevitt waived any right to require KLS to proceed against "any security now or hereafter held by [KLS], or to pursue any other remedy whatsoever." *Id.* § 4.1.  KLS could elect to pursue remedies against Sensei or security held by it, but it was not obliged to do so.  *Id.* § 6.1.  The Guaranty was "conditional" in the sense that it would be triggered only upon the occurrence of a Recourse Event.  It was not conditional with respect to McDevitt's obligations once a Recourse Event occurred.  Through this unconditional guaranty, KLS is permitted to seek judgment under the Guaranty against McDevitt without first resorting to Sensei's assets, i.e., the Collateral.  *See, e.g.*, *Milliken & Co. v. Stewart*, 582 N.Y.S.2d 127, 128 (1st Dep't 1992) ("Where a guaranty states that it is primary and unconditional and binds the guarantor to pay immediately upon the default of the debtor, it is considered to be a guarantee of payment and upon default the creditor may proceed directly against the guarantor in the first instance.").

This result is consistent with the New York UCC.[1]  New York UCC Section 9-620(a) provides that a secured party "*may* accept collateral in full or partial satisfaction of the obligation."  N.Y. UCC § 9-620(a); *see also* N.Y. UCC § 9-609(a) ("After default, a secured party . . . may take possession of the collateral.").  The secured party may, but is not obligated to, seek or accept such collateral.  *See Nat'l Cmty. Bank of N.J. v. Madura*, 623 N.Y.S.2d 613, 613 (2d Dep't 1995) ("We find no merit to the appellant's contention that the plaintiff was required, either by law, equity, or the terms of the guaranty in question to resort to collateral security before seeking a judgment against the guarantors. We therefore agree with the Supreme Court's conclusion that the appellant failed to produce evidence creating a triable issue of fact.") (citing 63 N.Y.Jur.2d, Guaranty and Suretyship § 235).

---

[1] The parties agree that the New York UCC governs here.

New York UCC Section 9-610(a) similarly gives the option to a secured party that already has collateral in its possession to dispose of it, including by selling it, but such action is not required.  That section provides, "[a]fter default, a secured party may sell, lease, license, or otherwise dispose of any or all of the collateral in its present condition or following any commercially reasonable preparation or processing."  N.Y. UCC § 9-610(a).  The party is not required to sell the collateral even if in its possession.  *See Chrysler Credit Corp. v. Dioguardi Jeep Eagle, Inc.*, 596 N.Y.S.2d 230, 232 (4th Dep't 1993) ("Although plaintiff obtained possession of the collateral by court order, it was not required to dispose of the collateral before commencing this action.  The only remaining issues of fact concern whether retention of the collateral was commercially reasonable and whether there is a deficiency."); *see also Warnaco, Inc. v. Farkas*, 872 F.2d 539, 543-44 (2d Cir. 1989) (stating that, under the Connecticut UCC, which is substantially similar to the New York UCC enactments relevant here: "[A] secured party in possession of collateral has a number of options. . . . [T]he party may, after notice to the debtor, dispose of the collateral in a 'commercially reasonable' fashion, either turning any surplus over to the debtor or pursuing the debtor for any deficiency after the sale.  Alternatively, the secured party may agree to accept the collateral in satisfaction of the debt . . . If the secured party does not accept the collateral in satisfaction of the debt, it retains its remedies . . . and those remedies are cumulative").

Here, KLS took possession and attempted to dispose of the Collateral but was unsuccessful.  If KLS had successfully sold the Collateral, there is no dispute that the proceeds from that sale if realized by KLS would be offset against the amounts KLS would be entitled to receive from McDevitt under the judgment.  If, at that sale, KLS realized less than McDevitt's obligations, McDevitt would pay the deficiency under the judgment; if KLS realized more than

McDevitt's obligations, KLS would pay the surplus to McDevitt.  *See* N.Y. UCC § 9-615(d) ("[I]f the security interest under which a disposition is made secures payment or performance of an obligation . . . the obligor is liable for any deficiency."); *Warnaco*, 872 F.2d at 543-44 ("The secured party may not of course collect more than the outstanding debt."); *see also Cantrade Priv. Bank Lausanne Ltd. v. Torresy*, 876 F. Supp. 564, 570 (S.D.N.Y. 1995) (holding that "the amount owed to [defendant] was the purchase price of the [asset] and not the fair market value of the [asset]").  But whether the sale proceeded or not would not change the amount that KLS is contractually entitled to collect in total under the Guaranty against McDevitt.  *See AmeriCredit Fin. Servs., Inc. v. Tompkins*, 604 F.3d 753, 757-58 (2d Cir. 2010) ("The parties do not dispute that the contract between them gives [plaintiff] the right to collect any deficiency from [defendants] if a sale of the vehicle fails to satisfy the debt, nor do they disagree that the law of New York permits such a property interest."); *Cantrade Priv. Bank Lausanne*, 876 F. Supp. at 570 (amount owed is "the difference between the final sale price of the [asset] and the amount of the debt remaining on the [guaranteed] loan"); *Bank of Am., N.A. v. Klein*, 2012 WL 5286962, at *4 (D. Conn. Oct. 23, 2012) (under New York law, damages were the debt less the sale proceeds of the collateral and interest).[2]

    This result is also consistent with cases holding that New York law "provides that, as a matter of law, it is not commercially unreasonable for a secured party to litigate damage claims on a debt while continuing to hold the secured property."  *VFS Fin., Inc. v. Shilo Mgmt. Corp.*,

---

[2] McDevitt does not challenge KLS's attempts to sell the collateral as being commercially unreasonable or otherwise raise a triable issue with regard to KLS's actions.  Only "if the secured party's compliance is placed in issue" does the "secured party ha[ve] the burden of establishing that the collection, enforcement, disposition, or acceptance was conducted" in a commercially reasonably manner."  N.Y. UCC § 9-626(a)(2); *see* N.Y. UCC § 9-610(b) (requiring that "[e]very aspect of a disposition of collateral, including the method, manner, time, place, and other terms, must be commercially reasonable").

372 P.3d 582, 584-85 (Or. Ct. App. 2016) (interpreting New York law); *see First Int'l Bank of Isr., Ltd. v. L. Blankstein & Son, Inc.*, 452 N.E.2d 1216, 1221 (N.Y. 1983) (holding "bank did not act in a commercially unreasonable manner when it proceeded against the notes rather than selling the diamonds it also held as collateral"); *Marine Midland Bank v. Hakim*, 669 N.Y.S.2d 212, 213 (1st Dep't 1998) (holding that "[p]laintiff's decision to sue on the note while retaining the collateral was within its rights" under UCC Article 9 and plaintiff was not required to "play the market" by selling nonperishable collateral during the litigation on the unpaid debt); *Chem. Bank v. Alco Gems Corp.*, 543 N.Y.S.2d 426, 428 (1st Dep't 1989) (noting that a bank could elect to sue on the debt while retaining the secured gems in its possession and such conduct was commercially reasonable).

McDevitt's remaining arguments fail.  McDevitt relies on a selective reading of the December 15, 2020 Opinion and Order to assert that the Court required his obligation to be reduced by the value of the Collateral.  *See KLS Diversified*, 2020 WL 7360658, at *29.  The language he quotes responded to and rejected his argument that KLS's foreclosure of Sensei's assets meant that Sensei had no remaining obligations for which McDevitt can be liable.  The thrust of the Court's opinion was that "KLS's remedies against Sensei in the event of a default were not in derogation of, but were in addition to, KLS's remedies against McDevitt under the Conditional Guaranty."  *Id.*  The Court made clear, in response to McDevitt's argument, that McDevitt's obligations under the Guaranty were independent of Sensei's obligations under the Note—KLS's choice to foreclose on the Collateral did not relieve McDevitt of his obligations with respect to the full amount due and owing.  All that is reflected in the portion of the opinion quoted by McDevitt was that KLS would not be entitled to double recovery: any amounts KLS

received from the sale of the Collateral or from Sensei would reduce the amount it would be able to collect on the judgment from McDevitt.

McDevitt's argument regarding the so-called "ambiguity" in the Guaranty and the Note is no more successful.  The two sections upon which McDevitt relies are not in derogation of KLS's clear rights under the Guaranty and cannot create ambiguity by McDevitt's mere say-so. Contractual language is not rendered ambiguous by the losing party's refusal to admit it is clear. *See Universal Am. Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 37 N.E.3d 78, 80 (N.Y. 2015) ("[P]arties cannot create ambiguity from whole cloth where none exists, because provisions 'are not ambiguous merely because the parties interpret them differently.'") (quoting *Mount Vernon Fire Ins. Co. v. Creative Hous. Ltd.*, 668 N.E.2d 404, 406 (N.Y. 1996)).  Section 8.2 of the Guaranty, upon which McDevitt relies, pertains to rights of McDevitt against Sensei. It provides that, upon a default, if McDevitt collects on any of Sensei's obligations to him, he does so as trustee for KLS and is required to pay to KLS all amounts received by him from Sensei.  The thrust and purpose of that provision is to ensure that McDevitt does not collect from Sensei ahead of KLS and that if he does so, he must turn over to KLS any sums he has collected. McDevitt fails to explain how a provision designed to protect KLS's rights as against Sensei and to impose obligations on McDevitt in order to do so somehow limits KLS's rights as against him. Section 4 of the Note, upon which McDevitt also relies, simply gives KLS a security interest in the Collateral.  It does not require KLS to accept that Collateral in satisfaction of the Note obligation.

Finally, as a fallback, McDevitt claims that the Guaranty is unconscionable.  That argument is waived for two reasons.  First, that argument goes to the question of liability and not to damages and thus should have been raised in opposition to the motion for summary judgment

on liability.  Second, McDevitt's unconscionability arguments fail through his broad waiver of defenses in Section 4 of the Guaranty.  *See* Dkt. No. 45-3 §§ 4.1(h), (k), (n).  Such "unconditional guaranties have been held to foreclose, as a matter of law, guarantors from asserting any defenses or counterclaims."  *HSH Nordbank AG N.Y. Branch v. St.*, 421 F. App'x 70, 73 (2d Cir. 2011) (citation omitted); *see Red Tulip, LLC v. Neiva*, 842 N.Y.S.2d 1, 5 (1st Dep't 2007) ("New York courts have consistently upheld broadly worded waiver language [as to defenses and counterclaims].").[3]  That argument also fails on the merits.

McDevitt argues that the transaction documents, not just the Guaranty, were procedurally and substantively unconscionable.  "The procedural element of unconscionability requires an examination of the contract formation process and the alleged lack of meaningful choice." *Gillman v. Chase Manhattan Bank, N.A.*, 534 N.E.2d 824, 828 (N.Y. 1988).  "The focus is on such matters as the size and commercial setting of the transaction, whether deceptive or high-pressured tactics were employed, the use of fine print in the contract, the experience and education of the party claiming unconscionability, and whether there was disparity in bargaining power."  *Id.* (internal citation omitted).  With one exception, McDevitt does not allege that any of these factors were present.  He argues there were gross disparities in bargaining power given Sensei's losses and McDevitt's desperation to find a source of funds and because KLS was more sophisticated than McDevitt.  But McDevitt was represented by counsel, he engaged in arms-length negotiations, and the record shows that McDevitt was seeking investors and pursuing KLS as opposed to the other way around.  *See, e.g.*, Dkt. No. 85 ¶¶ 3-4; Dkt. No. 49

---

[3] A guarantor cannot contractually waive the defense that a sale was not commercially reasonable.  *See Bank of China v. Chan*, 937 F.2d 780, 785 (2d Cir. 199).  But McDevitt does not attempt to argue or to provide any evidence supporting that KLS's actions were commercially unreasonable.

¶¶ 4-5, 7, 16.  McDevitt "thus would have been aware of the potential consequences of signing the guarant[y]."  *Wells Fargo Bank, N.A. v. Bivona & Cohen, P.C.*, 2015 WL 5752595, at *8 (S.D.N.Y. Sept. 30, 2015) ("[T]he guaranty represented an arms-length business transaction between sophisticated parties. . . . [A]t the time [defendant] signed the guarantees at issue, he was aware that the firm had been having financial difficulties."); *see also Don King Prods., Inc. v. Douglas*, 742 F. Supp. 778, 780 (S.D.N.Y. 1990) (finding no procedural unconscionability where there was "no allegation here that deceptive or high-pressure tactics were employed in concluding the contracts, that contract terms were concealed in fine print, or that there was a gross asymmetry in the experience and education of the parties, each of whom was represented by counsel throughout the course of their arms-length negotiations").

If the Court were to reach substantive unconscionability,[4] it would also find that the agreements were not substantively unconscionable.  Substantive unconscionability looks at "the substance of the bargain to determine whether the terms were unreasonably favorable to the party against whom unconscionability is urged."  *Gillman*, 534 N.E.2d at 829.  McDevitt argues only that the combined effect of certain provisions in these transaction documents meant that McDevitt was "ultimately sign[ing] over his company, all of its assets, and potentially $3,600,000 to Plaintiff," which was a "grossly unreasonable and unconscionable result against McDevitt."  Dkt. No. 87 at 19.  But even assuming "the terms are a 'bad bargain' [that] does not mean they are 'so grossly unreasonable or unconscionable in light of the mores and business practices of the time and place as to be unenforceable according to [their] literal terms.'"  *Red Fort Cap., Inc. v. Guardhouse Prods. LLC*, 2020 WL 5819549, at *9 (S.D.N.Y. Sept. 30, 2020)

---

[4] "In general, a provision will be deemed unenforceable on unconscionability grounds only where it is 'both procedurally and substantively unconscionable when made.'"  *NML Cap. v. Republic of Argentina*, 621 F.3d 230, 237 (2d Cir. 2010) (quoting *Gillman*, 534 N.E.2d at 828).

(quoting *Mayaguez S.A. v. Citigroup, Inc.*, 2018 WL 1587597, at *17 (S.D.N.Y. Mar. 28, 2018)).

At the time of the loan, Sensei needed funds, KLS took on risk in extending those funds, and

McDevitt lent his credit to the security KLS would receive in exchange for extending the loan.

The law does not permit the Court to second-guess the after-the-fact the judgment of both KLS

and McDevitt, with the aid of counsel, that the guaranty was necessary for KLS to extend the

credit and that it was in the best interests of both parties to agree to the transaction.

### B.    Accrued Interest

Plaintiff also seeks accrued interest at the contractual rate under the Note until the date of

judgment or, in the alternative, prejudgment interest under New York law.  McDevitt claims that

the Note only contemplates accrued interest up to the maturity date of January 1, 2019.  *See, e.g.*,

Dkt. No. 94 ¶ 11.  He also argues that N.Y. C.P.L.R. § 5001 provides that prejudgment interest is

in the Court's discretion and that neither Section 5001 nor the Guaranty or Note require interest

to be compounded quarterly.  Dkt. No. 87 at 12-13.

"Under New York C.P.L.R. § 5001, a creditor is entitled to prejudgment interest on all

sums due, as of the date they became due."  *Cap. Ventures Int'l v. Republic of Argentina*, 552

F.3d 289, 296 (2d Cir. 2009).  The applicable principles were set forth by the New York Court of

Appeals in *NML Capital v. Republic of Argentina*:

> When a claim is predicated on a breach of contract, the applicable rate of
> prejudgment interest varies depending on the nature and terms of the contract.  Most
> agreements associated with indebtedness provide a "contract rate" of interest that
> determines the value of the loan and that rate is used to calculate interest on
> principal prior to loan maturity or a default in performance.  If the parties failed to
> include a provision in the contract addressing the interest rate that governs after
> principal is due or in the event of breach, New York's statutory rate will be applied
> as the default rate. CPLR 5004 sets forth a statutory rate of 9% per annum.  For
> example, in *Chipetine v. McEvoy*, 238 A.D.2d 536, 537, 657 N.Y.S.2d 88 (2d Dep't
> 1997), where a debtor "executed a promissory note for the principal sum of
> $1,000,000, with interest at 12% per annum, payable to the plaintiff," interest on

the unpaid principal was calculated at the contract rate—12%—until the debtor defaulted on the note and, thereafter, was calculated at the statutory rate of 9%.

As an important corollary, New York courts have long held that when an agreement involving an indebtedness "provides that the interest shall be at a specified rate *until the principal shall be paid*, then the contract rate governs until payment of the principal, or until the contract is merged in a judgment." Said another way, when the principal on a loan is due on a date certain and the debtor fails to make payment, the interest rate in the contract will be used to calculate interest on unpaid principal from the date of maturity of the loan to the entry of judgment. Thus, inclusion of a clause directing that interest accrues at a particular rate "until the principal is paid" (or words to that effect) alters the general rule that interest on principal is calculated pursuant to New York's statutory interest rate after the loan matures or the debtor defaults.

952 N.E.2d 482, 488-89 (2011) (internal citations omitted).

Those principles decide the issue before the Court. Under the Note, Sensei had the obligation to pay KLS "at the rate of 4% per annum, which shall be compounded quarterly by adding accrued interest to the outstanding principal balance on the last day of each fiscal quarter of [Sensei]." Dkt. No. 45-1 at 1. The Note provides that "[i]nterest shall accrue from the date (the 'Issue Date') of [the Note]" and "[i]nterest shall be computed on the basis of a year of 360 days for the actual number of days elapsed." *Id.* Sensei was required to pay KLS interest at the contractual rate of 4% compounded quarterly for each period between the issuance of the Note and the maturity of the Note. *See, e.g.*, Dkt. No. 87 at 12-13. That contractual obligation lasted, however, only until maturity. After the date of maturity, Sensei had no obligation to continue to pay interest to KLS at the 4% rate. Its obligation was to repay the principal sum of $3.3 million plus accrued interest and, if it failed to do so, the Note provided "there shall be an Event of Default" and "th[e] Note shall accelerate and all principal and unpaid accrued interest shall become due and payable." *Id.* § 7. There is no language in the Note to the effect that Sensei was obligated to pay the contractual rate of interest until the principal was paid. *See Cap. Ventures*

*Int'l*, 552 F.3d at 296-97 (holding that contractual interest payments are no longer due after acceleration when the entire principal is immediately due and owing).

After the maturity of the Note and up until judgment, the law that applies is the 9% statutory rate provided for by New York law when a party is in "breach of performance of a contract." N.Y. C.P.L.R. § 5001(a); *see Swerdlow*, 2010 WL 1141145, at *5 (holding that creditor was entitled to prejudgment interest from guarantor at the statutory rate). Accordingly, KLS is entitled to interest at contractual rate up until the date of maturity and at the 9% statutory rate under New York law from the date of maturity until the date of judgment.

### C.     Attorney's Fees and Costs

Plaintiff seeks an award of attorney's fees and costs of 30% of any amount recovered. It bases that request on the Guaranty and Note Purchase Agreement and on the engagement letter between KLS and its counsel, Ballard Spahr, LLP ("Ballard"). Dkt. No. 88 ¶ 21; Dkt. No. 83-5 ¶ 9. Pursuant to the engagement letter, dated February 14, 2019, KLS agreed to compensate Ballard by payment of a fee that "shall be the lesser amount of (a) 30% of any amount recovered (through judgement or settlement) and (b) 2.5X the fee the firm would have earned on a purely hourly basis." *Id.* KLS also invokes provisions of the Guaranty and Note Purchase Agreement that require McDevitt to pay for attorney's fees and costs incurred in enforcing the Guaranty. *See* Dkt. No. 45-3 § 8.2 ("Guarantor shall immediately reimburse Holder for all fees and costs, including attorneys' fees, incurred by Holder for: (a) enforcement of this Guaranty or any of its terms."); Dkt. No. 45-2 § 7.9 ("If any action at law or in equity (including, arbitration) is necessary to enforce or interpret the terms of any of the Transaction Agreements, the prevailing party shall be entitled to reasonable attorneys' fees, costs and necessary disbursements in addition to any other relief to which such party may be entitled."); *id.* § 7.14 ("The prevailing

party shall be entitled to reasonable attorneys' fees, costs, and necessary disbursements in addition to any other relief to which such party may be entitled.").

Plaintiff calculates a judgment against McDevitt of $3,913,752.04, resulting in attorney's fees and costs of $1,174,125.60. It seeks total attorney's fees and costs of $1,677,322.29, however, which is "'grossed up' to include fees on fees." Dkt. No. 83-2 at 6 n.3; *see also* Dkt. No. 89 at 10. It relies on Section 8.2 of the Guaranty as the basis for asserting "fees on fees," which provides that "Guarantor shall immediately reimburse Holder for all fees and costs, including attorneys' fees, incurred by Holder for: (a) enforcement of this Guaranty *or any of its terms.*" Dkt. No. 45-3 § 8.2 (emphasis added). With the exception of these "fees on fees," McDevitt does not dispute that KLS is entitled to reimbursement for reasonable attorneys' fees and costs but rather argues that the fees and costs requested are not reasonable.

Under New York law, "when a contract provides that in the event of litigation the losing party will pay the attorney' fees of the prevailing party, the court will order the losing party to pay whatever amounts have been expended by the prevailing party, so long as those amounts are not unreasonable." *Diamond D Enters. USA, Inc. v. Steinsvaag*, 979 F.2d 14, 19 (2d Cir. 1992) (citation omitted); *see Wells Fargo Bank N.W., N.A. v. Taca Int'l Airlines, S.A.*, 315 F. Supp. 2d 347, 353 (S.D.N.Y. 2003) (where "a contract provides for shifting of the actual attorneys fees expended by the prevailing party, 'the court will order the losing party to pay whatever amounts have been expended . . . so long as those amounts are not unreasonable'") (quoting *F.H. Krear & Co. v. Nineteen Named Trustees*, 810 F.2d 1250, 1263 (2d Cir. 1987)).

At the same time, however, a defendant cannot be ordered to pay as attorney's fees an amount greater than "what the plaintiff must pay its attorneys" under the agreement in place between the plaintiff and its counsel. *See Parker Hannifin Corp. v. N. Sound Props.*, 2013 WL

19

3527761, at *3 (S.D.N.Y. July 12, 2013); *see also Mid-Hudson Catskill Ministry v. Fine Host Corp.*, 418 F.3d 168, 179 (2d Cir. 2005). "[U]nder New York law an indemnity provision must be 'strictly' construed. It follow[s] therefore, 'that the [attorney fee] clause does not permit plaintiff to demand from defendant greater expenses than plaintiff has itself incurred.'" *Id.* (internal citations omitted). In addition, "[i]n determining the reasonableness of attorneys' fees in the context of a contractual claim, a court examines a variety of factors, including 'the difficulty of the questions involved; the skill required to handle the problem; the time and labor required; the lawyer's experience, ability and reputation; the customary fee charged . . . for similar services; and the amount involved.'" *Swerdlow*, 2010 WL 1141145, at *6 (quoting *F.H. Krear*, 810 F.2d at 1263). Those factors may reduce the amount that the Court awards in attorney's fees; KLS is not entitled to reimbursement for attorney's fees and costs that were unreasonably incurred. They cannot result in KLS receiving an award from McDevitt in an amount greater than what KLS would owe Ballard under the engagement letter.

By the time of its motion for summary judgment on damages made on January 8, 2021, Ballard had recorded 1,939.60 hours for recorded time of $1,260.431.50 and its costs were $26,195.26. Dkt. No. 83-5 ¶ 4; *see also* Dkt. No. 91-2 ¶ 22. Together, Ballard's total recorded fees and costs were $1,286,626.76 through January 8, 2021. Dkt. No. 83-5 ¶ 4; Dkt. No. 91-2 ¶¶ 22-23. Ballard submitted its reply memorandum on January 29, 2021. Dkt. No. 89. The time recorded by Ballard through January 31, 2021 equaled $1,363,880. Dkt. No. 91-2 ¶ 31.

The $1,174,125.60 in attorney's fees requested by Ballard and owed under its agreement with KLS—before applying the "fees on fees"—is less than the amount that it would receive based on its actual time billed, or $1,363,880.[5] The Court has reviewed Ballard's time records

---

[5] This calculation does not include time recorded for the time period after February 2, 2021,

and the time it recorded was reasonable.  The number of hours recorded, though large, was justified given the complexity of the case and the efforts required by counsel.  The hourly rates for counsel are in line with hourly rates in similar commercial cases in this District.  *See, e.g.*, *Tessemae's LLC v. Atlantis Cap. LLC*, 2019 WL 2635956, at *4 (S.D.N.Y. June 27, 2019) ("Courts in this District have determined that hourly rates ranging from $250 to $1,260 per hour, for attorneys' work on a commercial litigation matter, were reasonable.").  Thus, the Court will approve an award of attorney's fees for the sums owed Ballard by KLS of 30% of the sum of the principal amount of the Guaranty of $3,330,000 and interest up to the date of judgment as calculated based on principles set forth in this Opinion.

The Court will not include in the judgment the "fees on fees" requested by Ballard on behalf of KLS because KLS does not owe these fees to Ballard under their engagement letter.  Under New York law, such "'fees on fees'—or fees for efforts expended in connection with collecting attorney fees—are not recoverable absent a specific contractual provision that 'explicitly provide[s] for such fees.'"  *Novick v. AXA Network, LLC*, 714 F. App'x 22, 26 (2d Cir. 2017) (quoting *Jones v. Voskresenskaya*, 5 N.Y.S.3d 16, 18 (1st Dep't 2015)); *see also 546-552 W. 146th St. LLC v. Arfa*, 950 N.Y.S.2d 24, 25 (1st Dep't 2012) ("[A]n award of fees on fees must be based on a statute or on an agreement.") (citation omitted).  Section 8.2 of the Guaranty states that McDevitt shall reimburse KLS for attorney's fees incurred by KLS "for enforcement of this Guaranty or any of its terms."  Dkt. No. 45-3 § 8.2.  The engagement letter between Ballard and KLS permits compensation to KLS of the lesser of 30% of the judgment or 2.5 times the fee it would have earned on an hourly basis.  It does not contemplate the payment of fees in

---

when the Court denied the summary judgment motion without prejudice based on Plaintiff's failure to produce time records and ordered the parties to submit additional briefing.

connection with the collection of attorney's fees.  The Guaranty language that KLS emphasizes, "any of its terms," does not reflect that KLS owes Ballard any more than what it agreed to pay Ballard under the engagement letter and therefore does not constitute a fee or cost incurred by KLS or for which KLS is entitled to reimbursement incurred for the enforcement of the Guaranty or its terms.

## CONCLUSION

Plaintiff's motion for summary judgment is GRANTED IN PART and DENIED IN PART.  Dkt. No. 91.

Plaintiff is directed to submit a proposed judgment by April 7, 2021 that awards damages of $3,330,000 and interest and attorney's fees and costs in accordance with this Opinion.

SO ORDERED.

Dated: April 2, 2021
     New York, New York                                LEWIS J. LIMAN
                                         United States District Judge