UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                                          :

KLS DIVERSIFIED MASTER FUND, L.P.,           :

                           Plaintiff,      :

                                            :                   19-cv-3774 (LJL)

         -v-                               :

                                            :         OPINION AND ORDER

SEAN MCDEVITT,                           :

                           Defendant.     :

------------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

       In this post-judgment proceeding, defendant Sean McDevitt ("Defendant" or "McDevitt")

moves, pursuant to Federal Rule of Civil Procedure 69[1] and Article 52 of the New York Civil

Practice Law and Rules ("CPLR"), for an order modifying the restraining notice served by

plaintiff KLS Diversified Master Fund, L.P. ("Plaintiff" or "KLS") on McDevitt pursuant to Rule

69 and CPLR § 5240 and modifying, or in the alternative, vacating the restraining notice served

by Plaintiff on Liberty Special Markets ("LSM").  Dkt. No. 104.

       For the following reasons, the motion to vacate the restraining notices is granted in part

and denied in part.

## BACKGROUND

### I.     The Underlying Litigation

       Familiarity with the Court's prior decisions and orders in this case is assumed.  On April

12, 2021, the Clerk of Court entered judgment against Defendant and in favor of Plaintiff in the

---

[1] Rule 69 provides:  "A money judgment is enforced by a writ of execution, unless the court
directs otherwise.  The procedure on execution – and in the proceedings supplementary to and in
aid of judgment or execution – must accord with the procedure of the state where the court is
located, but a federal statute governs to the extent it applies."  Fed. R. Civ. P. 69.

amount of $3,330,000 plus interest.  Dkt. No. 101.  Defendant has filed a notice of appeal.  Dkt. No. 103.

## II.    The Insurance Policy

The dispute involves rights to, and the ability to take advantage of, an executive liability insurance policy, which provides insurance coverage to McDevitt as an officer and director. LSM, a provider of insurance and reinsurance products, provided Executive Liability Insurance to Sensei, Inc.[2] (the "LSM Policy"), pursuant to which LSM provides directors and officers insurance to McDevitt as an Insured Person.  Dkt. No. 105 ¶ 5; Dkt. No. 121-4.  The LSM Policy covers Loss incurred by an Insured Person up to a policy limit of $5,000,000.  Dkt. No. 121-4. Loss is defined as the amount that the Insured Person becomes legally obligated to pay on account of a Claim made against the Insured Person for Wrongful Acts, and a Wrongful Act is defined to include, among other things, any matter claimed against the Insured Person by reason of their having served as an officer or director of Sensei.  *Id.* at 19.  Loss explicitly includes Defense Costs.  *Id.*  The LSM Policy also provides that "it shall be the right and duty of the Insurer and not the duty of the Insureds to defend any Claim, other than a Pollution Claim, even if such Claim is groundless, false, or fraudulent.  However, an Insured shall have the right to assume the duty to defend any such Claim by providing written notice thereof to the Insurer, provided the Insurer consents in writing to such assumption."  *Id.* at 9.  It further notes that if an Insured has the duty to defend a Claim, then LSM has the obligation to advance covered Defense Costs on behalf of the Insured upon the receipt of an appropriate invoice from counsel.  *Id.* at 10–11.

---

[2] Non-party Sensei, Inc. ("Sensei") is a Delaware corporation.  Defendant was an early investor in Sensei, and by 2014, he was the majority owner and Chief Executive Officer ("CEO") of Sensei.  At the end of 2016, he was Sensei's CEO, Chairman, and majority stockholder.  He was removed as CEO in May 2018.  Dkt. No. 73 at 1.

### III.     LSM's Role in This Litigation

Pursuant to the LSM Policy, McDevitt tendered upon LSM a notice of claim and, by letter dated June 26, 2019, LSM stated that it would defend McDevitt, subject to a reservation of rights. Dkt. No. 122-1 at 9.  LSM's reservation of rights letter noted that the Policy contained Exclusions for claims (1) based upon any deliberately fraudulent or criminal act or omission or willful violation of law by the Insured Person (if a final adjudication established such an act, omission, or violation occurred) or (2) based upon, arising out of, or attributable to the Insured Person gaining in fact any profits, remuneration, or financial advantage to which the Insured Person was not legally entitled (again, if established by a final adjudication).  *Id.* at 10.  The reservation of rights noted that the Complaint contained allegations of intentional acts and intentional misconduct and contained LSM's reservation to refuse to defend or indemnify McDevitt to the extent that the Complaint arose out of those exclusions.  *Id.* at 11.  Although LSM offered to McDevitt that he could select independent counsel, McDevitt waived that right, and LSM, with McDevitt's approval, selected Wood Smith Henning Berman LLP ("WSHB") to represent McDevitt.  *Id.* at 12–13; Dkt. No. 105 ¶ 6.

In a First Supplemental Coverage Letter dated May 4, 2020, LSM reiterated its reservation of rights and took the position that the allegations in the instant lawsuit had a common nexus with those in another lawsuit and thus constituted a single Claim under the LSM Policy.  Dkt. No. 122-1 at 16–19.[3]

In a Second Supplemental Coverage Letter dated April 28, 2021, LSM took note that this Court had entered an order of judgment in favor of KLS.  Dkt. No. 122-1 at 20–26.  LSM

---

[3] LSM took the position that the Wrongful Acts alleged by KLS had a common nexus with the Wrongful Acts alleged in two other matters and that the three matters therefore constituted a single Claim under the LSM Policy subject to a single Limit of Liability.  Dkt. No. 122-1 at 16.

continued to assert its reservation of rights.  It noted that the Court had determined that the evidence supported that McDevitt's failure to disclose threatened or pending litigation was material and a willful and intentional misrepresentation or omission and had also observed that the Conditional Guaranty offered McDevitt "substantial direct and indirect benefits from the issuance of the Note."  *Id.* at 21.  It stated that in the event of a final adjudication of such wrongful conduct, a policy exclusion might apply, and that as a result, LSM continued to reserve its rights to deny coverage for all Loss, including the Judgment and Defense Costs.  It continued to agree that "defense counsel's legal fees and expenses in connection with an appeal would constitute Defense Costs."  *Id.* at 24.  However, it deferred to McDevitt, in consultation with WSHB, whether to appeal the Judgment and Order.  *Id.*  LSM also agreed to pay for the premium of any appeal bond subject to the same reservation of rights.  *Id.*

**IV.** **The Restraining Notices and the Instant Dispute**

On or about May 13, 2021, Plaintiff served restraining notices on, among others, Defendant and non-party LSM pursuant to Rule 69 of the Federal Rules of Civil Procedure and Rule 5222 of the CPLR.  Dkt. No. 105 ¶ 5; *id.* at Exs. B, C.

The LSM Restraining Notice states, in pertinent part:

[P]ursuant to Rule 69 of the Federal Rules of Civil Procedure, as well as Rules [sic] 5222 of the New York Civil Practice Law and Rules, as set forth below, you are forbidden to make or permit any sale, assignment, or transfer of, or interference with, the Judgment Debtor's (Sean McDevitt) property that may be in your custody or possession to any person other than the sheriff or marshal except upon direction of the sheriff or marshal or pursuant to an order of the court, until the judgment is satisfied or vacated, except as provided in CPLR 5222(b).

Dkt. No. 105-5.

The McDevitt Restraining Notice contains similar language.  Dkt. No. 105-4.

On July 28, 2021, Plaintiff sent a letter to counsel for LSM.  Dkt. No. 105-6.  The letter stated in relevant part:

> We understand that Liberty has accepted McDevitt's claim under policy number ELL-P-0497655 (the "Policy") and is advancing McDevitt defense costs in the litigation.  Any such payments after May 13, 2021 and during the pendency of the Restraining Notice, either to Mr. McDevitt or on his behalf, would violate the Restraining Notice and constitute a contempt, as would the acceptance of any such payments.  Please know that KLS intends to enforce the Restraining Notices to the fullest extent possible and reserves all rights.

Dkt. No. 105-6.

In response, on November 2, 2021, WSHB wrote to counsel for LSM.  Dkt. No. 105-7.  WHSB's letter stated that LSM had retained WSHB to represent McDevitt, and recounted that WHSB had approximately $200,000 in unpaid legal fees, some of which was for work rendered prior to July 28, 2021, the date of the Restraining Notices.  *Id.* at 2.  It also relayed that, during a telephone call between WSHB and LSM on August 3, 2021, LSM had stated that it "did not believe the LSM Notice to be a valid restraining notice pursuant to Article 52 of the CPLR," but that it "would nonetheless be suspending any further payment to [WSHB] for legal fees in connection with th[e] matter."  *Id.*  WSHB advised that it was the firm's "position that LSM is required to pay WSHB's legal fees and costs, as such payments do not run afoul of the LSM notice insofar as they are not otherwise available to McDevitt to satisfy any pending judgment in connection with this matter."  *Id.*  It also stated that if it did not receive payment of its outstanding legal fees within fifteen days of the date of the letter, it would be moving to withdraw as counsel for McDevitt.  *Id.*[4]

On November 8, 2021, counsel for LSM responded.  Dkt. No. 105-8.  It stated:  "[O]ut of an abundance of caution, LSM cannot proceed with payments on outstanding invoices while the Restraining Notice is pending."  *Id.* at 2.  It also asked that WSHB "remain as defense counsel for Mr. McDevitt at least during the course of his fully-briefed appeal including any oral

---

[4] WSHB has not filed a motion to withdraw as counsel for McDevitt in his appeal before the Second Circuit.  *See KLS Diversified Master Fund, L.P. v. McDevitt*, No. 21-1263 (2d Cir.).

arguments that may be scheduled as part of the appeal while the Restraining Notice is further addressed." *Id.*[5]

## DISCUSSION

McDevitt argues that the Restraining Notices should be modified or vacated pursuant to Federal Rule of Civil Procedure 69 and CPLR § 5240. Dkt. No. 107. He argues that, to the extent that the Restraining Notices purport to prohibit LSM from paying defense costs incurred by WSHB in this litigation and the ongoing appeal, including attorneys' fees, they would cause "unreasonable annoyance, expense, embarrassment, disadvantage, or other prejudice," *Guardian Loan Co. v. Early*, 392 N.E.2d 1240, 1242 (N.Y. 1979), and thus must be modified. Dkt. No. 107 at 1–2. McDevitt also argues that he has only a limited and indirect interest in the LSM Policy, with no ability to direct LSM to use or pay the policy proceeds for any purpose other than as set forth in the LSM Policy, and that such interest is insufficient to allow a judgment creditor to attach the policy proceeds and prevent LSM from using the proceeds to pay WSHB in accordance with the Policy. *Id.* at 2.

"New York procedure for enforcement of judgments is set out in Article 52 of the Civil Practice Law and Rules. The first section of Article 52 describes the assets that New York law has made subject to enforcement, and thus available to judgment creditors." *Karaha Bodas Co.,*

---

[5] The correspondence between WSHB and LSM also addressed whether WSHB would move this Court to modify the Restraining Notice. WSHB advised that while it initially had intended to prepare and file a motion to vacate the LSM Notice, it had since determined that it did not have the proper standing to move to vacate the LSM Notice, as it had been served on and pertained to LSM. Dkt. No. 105-7 at 2. LSM stated that WSHB's letter of a few days earlier was the first that it had learned that WSHB would not be able to respond to the LSM Restraining Notice and asked WSHB to reconsider its position of not filing a motion or other response to the Restraining Notice on McDevitt's behalf as well as on behalf of WSHB. Dkt. No. 105-8 at 2. Counsel for LSM added that had it been informed of WSHB's position earlier, it "could have conferred with LSM as to how to proceed with respect to the Restraining Notice separate and apart from your purported efforts, including the potential retention of counsel for LSM regarding the issue." *Id.*

*L.L.C. v. Perusahaan Pertambangan Minyak Dan Gas Dumi Negara*, 313 F.3d 70, 83 (2d Cir.

2002) (internal quotation marks omitted) (quoting *Alliance Bond Fund, Inc. v. Grupo Mexicano*

*De Dasarrollo, S.A.*, 190 F.3d 16, 20 (2d Cir. 1999)).  CPRL § 5201(b) addresses the property

against which a money judgment may be enforced.  It states:

> **Property against which a money judgment may be enforced.**  A money
> judgment may be enforced against any property which could be assigned or
> transferred, whether it consists of a present or future right or interest and whether
> or not it is vested, unless it is exempt from application to the satisfaction of the
> judgment.

CPLR § 5201(b).[6]  "In New York, . . . a party seeking to enforce a judgment 'stand[s] in the

shoes of the judgment debtor in relation to any debt owed him or a property interest he may

own.'"  *Karaha Bodas Co.*, 313 F.3d at 83.

    CPLR § 5222 addresses restraining notices.  It provides in relevant part that "[a]

restraining notice may be issued by . . . the attorney for the judgment creditor as officer of the

court . . . upon any person, except the employer of a judgment debtor or obligor where the

property sought to be restrained consists of wages or salary due or to become due to the

judgment debtor or obligor."  CPLR § 5222(a).  The statute also contains a list of money or

property said to be exempt from being taken to satisfy a judgment or order.  CPLR § 5222(e).

---

[6] KLS appears to dispute whether this is the applicable test.  It asserts:
> Defendant – without citation to any authority – claims that the test of whether funds
> used to pay his legal fees are property in which he has an interest turns on whether
> he has a "right or authority to 'assign or transfer' any of the LSM Policy proceeds
> other than as authorized by the term of the Policy."  Def. MOL at 11.  . . . Leaving
> aside whether the test created by Defendant is actually applicable (it is not) . . . .

Dkt. No. 117 at 3.  As CPLR § 5201(b) makes clear, and as articulated by the Second Circuit,
this is precisely the relevant test.  *See* CPLR § 5201(b) ("A money judgment may be enforced
against any property which could be assigned or transferred . . . ."); *see also Karaha Bodas Co.*,
313 F.3d at 83 ("A determination of [the judgment debtor's] property interest in the disputed
funds—i.e., whether [the judgment debtor] can 'assign or transfer any of those funds' is therefore
dispositive." (quoting CPLR § 5201(b))).

CPLR § 5240 gives the Court authority to modify a restraining notice, including one issued by the attorney for the judgment creditor.  It provides:  "The court may at any time, on its own initiative or the motion of any interested person, and upon such notice as it may require, make an order denying, limiting, conditioning, regulating, extending or modifying the use of any enforcement procedure."  CRPL § 5240.

The Court has jurisdiction to "hear ancillary disputes relating to execution and enforcement of judgments [as] an inherent part of a court's jurisdiction over the underlying case."  *S.E.C. v. Pentagon Capital Mgmt. PLC*, 2013 WL 5815374, at *5 (S.D.N.Y. Oct. 29, 2013) (internal quotation marks omitted) (quoting *EM Ltd. v. Republic of Argentina*, 695 F.3d 201, 208 (2d Cir. 2012)).

## I.       Prejudice to McDevitt

Defendant argues first that the restraining notices should be modified to permit him to use the proceeds of the LSM Policy to pay his defense costs and to permit LSM to pay attorneys' fees.  He asserts that, without the ability to pay for attorneys' fees, he will not be able to retain counsel and will be forced to proceed pro se on his appeal in the Second Circuit.  Although the briefs have already been filed, the case has not yet been argued or scheduled for argument.

Defendant's argument is without merit.  Section 5240 "vests the court with broad discretion to prevent abuse in the use of the enforcement procedures of CPLR article 52." *Guardian Loan Co.*, 392 N.E.2d at 1241.  Its purpose is "to prevent 'unreasonable annoyance, expense, embarrassment, disadvantage, or other prejudice to any person or the courts.'"  *Id.* at 1242 (quoting Third Preliminary Report of the Advisory Comm. on Practice and Procedure, 1959, p. 314); *see also Paz v. Long Island R.R.*, 661 N.Y.S.2d 20, 22 (2d Dep't 1997); 18 David D. Siegel et al., N.Y. Practice § 485 (6th ed.) ("CPLR 5240 does for Article 52 and the enforcement devices what CPLR 3103 does for Article 31 and the disclosure devices: it sets forth

in one place an omnibus judicial power to intervene in the use of any device so as to prevent, on a case by case basis, any unjustified harassment or oppression.").

The courts thus have sanctioned its use to "restrai[n] impending sales of residences on the grounds that creditors could easily resort to less intrusive means to satisfy judgment," or where "there has been a showing that a judicial sale will not bring a representative price." *Guardian Loan Co.*, 392 N.E.2d at 1243.  Use of Section 5240 has also been approved where the amount of the judgment should have been reduced and the notice seeks to retrain greater property than would be necessary to satisfy the judgment, *see Paz*, 661 N.Y.S.2d at 22, or where the judgment debtor has no property interest in the restrained funds, *see Karaha Bodas Co.*, 313 F.3d at 84; *see also* Siegel, N.Y. Practice § 522 (noting other examples including to vary the sale time of real property or to vacate an income execution after an installment payment order was entered against the judgment debtor).  However, Section "5240 does not create substantive rights and . . . CPLR § 5222 does not allow a statutory exemption for attorney fees."  *Pentagon Capital Mgmt.*, 2013 WL 5815374, at *5; *see also Milgram v. Orthopedic Assocs. Defined Contribution Pension Plan*, 666 F.3d 68, 78 (2d Cir. 2011) (holding that section 5240 "provide[s] no substantive rights").

McDevitt argues that he is prejudiced by the inability to use the Policy to pay for his defense lawyer.  That is not the type of prejudice Section 5240 is intended to address.  The same prejudice is suffered by any judgment debtor who—after the assets necessary to satisfy a judgment are restrained—has insufficient remaining assets to pay for defense counsel.  A judgment, however, has consequences.  It permits the judgment creditor to restrain the judgment debtor's assets to prevent their dissipation until the judgment is satisfied.  Moreover, "attorney fees are not a statutorily exempted category under CPLR § 5222 [and] there is no constitutional

right to counsel in a civil proceeding." *Pentagon Capital Mgmt.*, 2013 WL 5815374, at *5. Only a limited number of rights or interests of the judgment debtor are explicitly exempted from being restrained; attorney fees are not one of them. The fact that McDevitt may not have other assets which he could use to pay defense counsel would not justify him in using the assets in which he has a right or interest to fund his defense if the same assets could be used to satisfy the judgment.

The two cases upon which McDevitt principally relies do not require a contrary result. In *Pentagon Capital Management*, the court modified a restraining notice issued by the United States Securities and Exchange Commission following entry of judgment in its favor that prevented the corporate defendant judgment debtor from paying the attorneys' fees necessary for it have to representation in filing an *en banc* rehearing petition, in filing a petition for Supreme Court review, and in post-judgment proceedings before the district court. 2013 WL 5815374, at *5. Unless the funds were released, the judgment debtor would have no ability to pay for representation in appellate court or in post-judgment proceedings. Because "a corporation cannot represent itself in a civil action," the judgment debtor would not be able to pursue further appellate review without "the ability to appoint and compensate counsel," causing an "injustice if [the corporate judgment debtor] were precluded from pursuing appellate review and adequately responding to the SEC's post-judgment discovery requests." *Id.* at *6. *Townsend Farms, Inc. v. Göknur Gida Maddeleri Enerji Imalate Ithalat Ihracat Ticaret ve Sanayi A.Ş.*, also involved a corporate judgment debtor unable to represent itself. 2020 WL 7260513, at *4 (S.D.N.Y. 2020). Absent modification, the effect of the restraining notice would be to prevent the judgment debtor from paying counsel "to advance whatever rights it might have as a judgment debtor." *Id.*

McDevitt is not a corporate defendant.  He has a right to prosecute his appeal as a pro se party.  *See* 28 U.S.C. § 1654 ("In all courts of the United States the parties may plead and conduct their own cases personally or by counsel . . . ."); United States Court of Appeals for the Second Circuit, How to Appeal as a Pro Se Party, *available at* https://www.ca2.uscourts.gov /clerk/case_filing/appealing_a_case/pro_se/how_to_appeal_as_a_pro_se_party.html.  A party proceeding pro se before the Second Circuit has the same right that anyone has to request oral argument.  *See* How to Appeal as a Pro Se Party.  That is the only step that remains in this case; counsel has already submitted briefs.  The Second Circuit may or may not grant that request.  It might not have granted the request even if McDevitt were represented or might grant only limited time.  But if the Second Circuit chooses not to allow McDevitt argument, it will not be because of any statutory bar based on his pro se status or his inability to afford counsel.  *Id.*  Nor, assuming his arguments would have been better presented by counsel than by himself would that entitle him to use funds that the legislature has authorized KLS to restrain and that are necessary to satisfy its judgment.  The Court therefore cannot conclude that he will suffer "disadvantage or other prejudice" within the meaning of the CPLR.

## II.     McDevitt's Interest in the LSM Policy Proceeds

McDevitt's second argument is that the restraining notices are invalid because he does not have a sufficient property interest in the LSM Policy proceeds under CPLR § 5222.

Under CPRL § 5222, a restraining notice issued to a third party only has effect "if, at the time of service, [the third party] owes a debt to the judgment debtor . . . or he or she is in possession or custody of property in which he or she knows, or has reason to believe the judgment debtor . . . has an interest."  CPLR § 5222(b).  "The notices only reach property and debts with such a connection to the judgment debtor.  If the third parties do not have property or debts in which the judgment debtor has an interest, the restraining notices are not effective."  *AG*

*Worldwide v. Red Cube Management AG*, 2002 WL 417251, at *8 (S.D.N.Y. Mar. 15, 2002). "The legal 'interest' owned by the judgment debtor in the property held by the third party 'must be . . . a direct interest in the property itself which . . . is leviable and not an indirect interest.'" *Preferred Display, Inc. v. CVS Pharmacy, Inc.*, 923 F. Supp. 2d 505, 509 (S.D.N.Y. 2013) (quoting *JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. & Trade Servs., Inc.*, 295 F. Supp. 2d 366, 391 (S.D.N.Y. 2003)).  In New York, "indebtedness is not attachable unless it is absolutely payable at present or in the future to the judgment debtor . . . and not dependable on any contingency."  *Sheehy v. Madison Square Garden Corp.*, 193 N.E. 633, 633 (1934).  "The judgment creditor stands in the shoes of the judgment debtor, and if a given property, asset, interest, or deposit is unavailable to the debtor, it is unavailable to the creditor.  We can call this the stand-in-the-shoes rule, and it can answer many questions."  Seigel, N.Y. Practice § 488.

In interpreting this body of law, three cases are particularly relevant.

First, in *Seider v. Roth*, the New York Court of Appeals considered whether "in a personal injury action against a nonresident defendant, . . . a defendant's liability insurer's contractual obligation to defend and indemnify defendant a 'debt' owing to defendant and as such subject to attachment under CPLR 6202."[7]  216 N.E.2d 99, 100 (N.Y. 1966).  The facts of the case are simple:  The plaintiffs were injured in an automobile accident, which they alleged was due to the negligence of the defendant.  *Id.*  The defendant had an automobile liability policy, issued to him by Hartford Accident and Indemnity Company ("Hartford"), to defend him in any automobile negligence action and to indemnify him if any judgment is rendered against him.  *Id.*  The plaintiffs—in an attempt to obtain jurisdiction over the defendant, who was a

---

[7] CPLR § 6202 refers back to CPLR § 5201; it provides that "[a]ny debt or property against which a money judgment may be enforced as provided in section 5201 is subject to attachment." CPLR 6202.

Quebec resident, in New York, through Hartford, which did business in New York—sought to attach the obligation of Hartford to defend and indemnify the defendant. *Id.* The court viewed the "whole question" as "whether Hartford's contractual obligation to defendant is a debt or cause of action such as may be attached," and ruled that "as soon as the accident occurred, there was imposed on Hartford a contractual obligation which should be considered a 'debt' within the meaning of CPLR 5201 and 6202." *Id.* at 101. Subsequently, in *Rush v. Savchuk*, the Supreme Court overruled the personal jurisdiction implications of *Seider*, holding that such jurisdiction "shift[s] the focus of the inquiry from the relationship among the defendant, the forum, and the litigation to that among the plaintiff, the forum, the insurer, and the litigation," which approach is "forbidden", under the Supreme Court's jurisprudence focusing on the defendant's contacts with the forum. 444 U.S. 320, 332 (1980). *Rush*, however, does not address *Seider*'s construction of the CPLR or its conclusion that, under some circumstances, a contractual obligation to be indemnified for defense costs can be considered a debt which a plaintiff could attach.

Second, in *Security National Bank v. Associated Hospital Service of New York*, the New York Supreme Court considered whether a judgment creditor could recover from an insurer on a judgment which the creditor had obtained against one of the insurer's subscribers in an unrelated action. 313 N.Y.S.2d 561, 561 (N.Y. Sup. Ct. 1970). The subscriber had a family contract with the insurer through his employer's group contract with the insurer. *Id.* at 562. His wife was admitted to a hospital, and incurred hospital bills during her stay there; when she was admitted to the hospital, the subscriber told the hospital about this coverage, and the hospital, pursuant to its contract with the insurer as a participating hospital in its plan, submitted a form to the insurer with the details of the admission and claim. *Id.* Subsequently, the subscriber's judgment creditor served a restraining notice on the insurer, which had not yet paid the hospital for the

subscriber's wife's treatment.  The court framed one of the pertinent issues as "whether [the insurer] is indebted to the judgment debtor, [the subscriber] rather than [the hospital]."  *Id.*  In deciding that issue, the court considered several factors: (1) that the hospital had agreed to accept compensation for services only from the insurer, at rates and on bases determined by the insurer; (2) that hospital service benefits under the group contract are personal to the subscriber and not assignable; and (3) that the "only right that [the subscriber] had against [the insurer] was the right to hospital benefits," whereas "[t]he right to payment for such benefits ran directly to the Hospital from [the insurer]," with the subscriber as a "third-party beneficiary to the contract between [the insurer] and [his employer] only to the extent that he receives hospital benefits."  *Id.* at 563–64.  The court concluded that the insurer "owes no debt to the subscriber."  *Id.* at 564.[8]

Finally, in *XL Specialty Insurance Company v. Lakian*, another court in this district considered the proper allocation of proceeds of a financial services liability policy purchased by the defendant's employer.  243 F. Supp. 3d 434, 436 (S.D.N.Y. 2017).  As relevant here, the court considered whether a judgment creditor who asserted a claim to those funds could attach the defendant's coverage under the policy.  *Id.* at 445.  The judgment creditor asserted that "the coverage afforded to [the defendant] under [the insurance policy] constitutes a 'debt' under C.P.L.R. § 5201(a) or a 'property' under C.P.L.R. § 5201(b) that is subject to attachment by [the judgment creditor] as a judgment creditor under C.P.L.R. § 6202."  *Id.* at 447.  The court concluded, however, that under the stand-in-the-shoes rule, because the defendant "is not entitled to recover any portion of the [funds] under the Policy, [the judgment creditor's] attempt to attach

---

[8] The court distinguished *Seider* on the grounds that the contract at issue in *Security National Bank* provided that where the insurer provided hospital services to someone who the contract holder—the employer—represented to the insurer was a subscriber, and was subsequently found not to be a subscriber, the employer was contractually obligated to reimburse the insurer.  *Id.*

[the defendant's] interest fails." *Id.* The court emphasized that the policyholder was defendant's employer, and defendant was a third-party beneficiary of that agreement. *Id.* The court concluded that "[t]he benefit due to [the defendant] under the Policy is not 'debt' owed to [the defendant] that may ever be 'due or . . . become due,' nor is it a 'property' that can 'be assigned or transferred.'" *Id.* at 447–48 (internal citations omitted) (first quoting C.P.L.R. § 5201(a); and then quoting C.P.L.R. § 5201(b)). The court cited Siegel, N.Y. Practice's statement that "[i]f the judgment debtor has no right to the money or property, then neither has the judgment creditor, even though the money due may be due in conjunction with a transaction in which the judgment debtor was much involved, and perhaps the key figure." *Id.* at 448.[9]

Subsequently, in *Pangea Capital Management, LLC v. Lakian*, the same judgment creditor sought to attach the same funds. 2017 WL 4517557, at *1 (S.D.N.Y. Sept. 13, 2017). The only difference was that, in the interim, the parties to the previous *XL Specialty* action "entered into a settlement agreement pursuant to which most of the interpleaded fund would be allocated among the parties for services previously rendered. The balance would 'be deposited into an escrow account in the custody and care of [defendant's defense counsel] for the benefit of' [defendant] in his ongoing defense [in an unrelated action]." *Id.* The escrow agreement provided that the defense counsel would bill the defendant for its services by sending him a monthly invoice, and that if the defendant failed to object to such notice, defense counsel could release funds from the escrow account to pay its invoice. *Id.* In *Pangea Capital Management*, the defense counsel law firm filed a motion as an interested party for relief from a restraining

---

[9] Echoing the language of *Security National Bank*, the court distinguished *Seider* on the grounds that *Seider* "involved an insurer's obligation to defend and indemnify an insured judgment debtor" whereas in *XL Specialty*, the judgment debtor was "a third-party beneficiary." *Id.* at 448 n.7.

notice served by the judgment creditor on the Clerk of Court restraining disbursement of certain funds; the court vacated the restraining notice. *Id.* The firm argued that the judgment creditor had "no claim to the restrained funds because [the defendant] 'does not have a direct, leviable interest in the insurance proceeds, which by the terms of the Policy must be used to pay for litigation defense' . . . ." *Id.* at *2. The court agreed, reasoning that even assuming a meaningful difference between the judgment creditor's claim in *XL Specialty* and its claim here, the question still turned on whether the restrained funds were due or might ever become due to the defendant. *Id.* The court concluded that "[j]ust as the funds did not 'become due' to [defendant] under the insurance policy of which he was a third party beneficiary, they never can become due to [the defendant] under the escrow agreement." *Id.*

*Seider*, *Security National*, and the two *Lakian* cases demonstrate that the applicable rule whether the contractual obligation of an insurer to pay money on behalf of a judgment debtor constitutes a "debt" to the judgment debtor restrainable under the CPLR turns upon the relationships among the insurer, the policyholder, the insured party, and the payee under the policy. If the right to be indemnified under the Policy runs directly to the insured, *i.e.*, if the insured has a claim to moneys from the insurer, which the insured can then exercise discretion how to expend, the insured has a "debt" which can be attached. There is no reason in logic or law why the obligation of an insurance company to indemnify an insured for costs the insured has incurred should differ from the obligation of any other third party to make good on an enforceable obligation to the judgment debtor. The right to repayment is an asset which can be attached. If, by contrast, the right to payment runs only to a third party and if the only interest the judgment debtor has is "an indirect interest," *Preferred Display, Inc.*, 923 F. Supp. 2d at 509, and the judgment debtor benefits "only to the extent that he receives" benefits from the third

party, *Security National*, 313 N.Y.S.2d at 563–64, the judgment creditor has no right or interest that can be restrained.  In a dispute between the third-party payee or the judgment debtor or one who stands in his shoes, the third party wins.

This understanding is reinforced by reasoning from bankruptcy law.  Under Chapter 11, the bankruptcy estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case," "wherever located and by whomever held."  11 U.S.C. § 541.  In *Matter of Edgeworth*, the Fifth Circuit considered whether insurance proceeds were property of the bankruptcy estate under that definition.  993 F.2d 51, 55 (5th Cir. 1993).  The court noted that the definition "is intended to be broadly construed," and "courts are generally in agreement that an insurance policy will be considered property of the estate," because "regardless of who the insured is, the debtor retains certain contract rights under the policy itself."  *Id.*  However, the court emphasized that this is not dispositive of whether proceeds of an insurance policy are part of a bankruptcy estate.  *Id.*  The relevant inquiry is similar to the inquiry in the attachment context—"whether the debtor would have a right to receive and keep those proceeds when the insurer paid on a claim.  When a payment by the insurer cannot inure to the debtor's pecuniary benefit, then that payment should neither enhance nor decrease the bankruptcy estate."  *Id.* at 55–56.  The court distinguished between "casualty, collision, life, and fire insurance policies" on the one hand, and "the typical liability policy" on the other hand.  *Id.* at 56.  It reasoned that with the former types of policies, "[p]roceeds of such policies, if made payable to the debtor rather than a third party such as a creditor, are property of the estate and may inure to all bankruptcy creditors."  In contrast, with the latter type of policy—a typical liability policy—"the debtor will not have a cognizable interest in the proceeds of the policy.  Those proceeds will normally be payable only for the benefit of those harmed by the debtor under the terms of the insurance

17

contract." *Id.* The court then analyzed the specific policy at issue in the dispute before it, considering both the nature of the policy and the way in which the proceeds were to be paid out under that policy. *Id.* This reasoning supports the notion first that the type of insurance policy is relevant, and second that the facts of the policy at issue and the relationships between the insurer, the policyholder and the parties who will receive the benefits of the insurance proceeds—and the insured persons, if they are different than the policyholders—are relevant.

In *Landry v. Exxon Pipeline Co.*, applying the *Edgeworth* rationale, a bankruptcy court emphasized that in the liability insurance context, the "debtor may have an interest, albeit a self-serving interest, in having a third party (the insurance company) pay for its wrongdoing, but this is not a legal or equitable interest *in the property* used to pay the claim. The interest the insured debtor has is the contractual right to have its own assets protected from exposure by means of the insurance contract, according to the terms of the contract." 260 B.R. 769, 787 (M.D. La. 2001). That court further reasoned, in an analogy that is apt both in the bankruptcy context and the attachment context at issue in the instant case:

> [T]he proceeds of general liability insurance (as opposed to indemnification of liability insurance) are (to a point) analogous to a third-party guarantor's funds used to pay a loan upon the default of a primary obligor. This Court believes that it is beyond question that the property of a guarantor, used by a guarantor to effect payment on a guaranteed loan (on which the debtor is principally obligated) would not be considered property of the estate of the principal obligor. The duty of the guarantor to pay the debt is separate and independent of the primary obligor's. The guarantor satisfies its obligation from its own assets, not those of the debtor. The debtor holds no legal or equitable interest in the property of the guarantor used to satisfy the outstanding obligation of both the guarantor and the debtor. The estate merely receives the benefit of the payment by a corresponding reduction in its liability to the bank.

> Of course, argument by analogy inevitably fails at some point (otherwise it would not be an analogy, but rather the identical argument). In the guarantor situation, the debtor would exchange liability to the bank for liability (for the amount of the payment) to the guarantor to the extent of the guarantor's payment, by means of contribution or indemnity. With liability insurance, the debtor is not bound to repay the insurance company in full for the insurance company's payment of the claim.

So there is a difference.  Nonetheless, the core concept within the analogy remains intact—the funds held by the guarantor and used to pay its obligation are the guarantor's alone.

*Id.* at 787–88.

The conclusion to this motion readily follows from the reasoning of *Seider*, *Security National*, and the two *Lakian* cases and the analogy to bankruptcy law.  Under the LSM Policy, the only ripe, non-contingent obligation LSM has is to WSHB.  It has no ripe, non-contingent obligation directly to McDevitt.  Accordingly, McDevitt has no direct interest in the Policy and the LSM restraining notice exceeds that permitted by Section 5222 and is not effective.

As outlined in detail above, the LSM Policy at issue here is an executive liability insurance policy entered into between LSM, the insurer, and Sensei, the policyholder and McDevitt's employer.  McDevitt is covered as an Insured Person under that policy.  Two provisions of the LSM Policy are relevant here.  First, subsection 7 of the LSM Policy provides that:

> Subject this Subsection 7, it shall be the right and duty of the Insurer and not the duty of the Insureds to defend any Claim, other than a Pollution Claim, even if such Claim is groundless, false, or fraudulent. However, an Insured shall have the right to assume the duty to defend any such Claim by providing written notice thereof to the Insurer, provided the Insurer consents in writing to such assumption.

Dkt. No. 121-4 at 9.  Second, subsection 7 also provides that:

> Subject to Subsection 8 of these General Terms and Conditions, if an Insured has the duty to defend a Claim, the Insurer shall advance on behalf of the Insureds covered Defense Costs which the Insureds have incurred in connection with such Claim no later than within ninety (90) days from the receipt of invoices appropriately prepared pursuant to the Insurer's defense billing guidelines, provided that to the extent it is finally established that any such Defense Costs are not covered under this Policy, the Insureds, severally according to their interests, shall repay the Insurer such Defense Costs.

*Id.* at 10–11.

KLS puts much weight on the second of these clauses, arguing that it proves that "[t]he distinction [that LSM makes between an obligation directly to WSHB rather than to Defendant] is meaningless," because "[t]he Policy makes clear that the advancement of legal fees is 'on behalf of' the Defendant, who is personally responsible for repayment of those fees to the Insurer should it be determined that the costs are not indemnifiable."  Dkt. No. 121 ¶ 13 (citing the language of subsection 7 at 10–11 but omitting the opening phrase "if an Insured has the duty to defend a Claim").  The argument misreads the relevant language of subsection 7.  Subsection 7 must be interpreted "as a whole, applying plain meaning to all of its language, attempting to effectuate the commercial understanding of the parties, and avoiding interpretations that would render language surplusage or the promises contained in the agreement illusory." *Town & Country Linen Corp. v. Ingenious Designs LLC*, --- F. Supp. 3d ---, 2021 WL 3727801 (S.D.N.Y. Aug. 23, 2021); *see also Charter Oak Fire Ins. Co. v. Zurich Am. Ins. Co.*, 462 F. Supp. 3d 317 (S.D.N.Y. 2020) (applying this principle in the insurance contract, and noting that a party's interpretation of the insurance contract "violates two cardinal rules of interpretation: (1) language must be read in context and (2) language must be read, where possible, to give meaning to each word in an agreement"); *1070 Park Avenue Corp. v. Fireman's Fund Ins. Co.*, 313 F. Supp. 3d 528, 540 (S.D.N.Y. 2018) (interpreting insurance contract by "[r]eading the policy . . . as a whole, rather than focusing on the singular word").  Applying that canon of interpretation, the distinction between those cases in which the insured has assumed a duty of defense—which requires both that the insured affirmatively opt out of the default rule that the insurer has the duty to defend and that the insurer consent to such assumption of the duty by the insured—and those in which it has not is meaningful.  In the former case, where the insured has elected to assume a defense and the insurer has consented to such assumption, the obligation to indemnify runs

directly to the insured.  It has a direct claim or interest up to the amount of the incurred defense

costs.  By contrast, in the latter case, where the insured has not elected to assume the defense but

has left it to the insurer to exercise its right to defend a claim, the obligation does not run directly

to the insured, nor can the insured control the use of the insurer's funds for the defense.  The

insured benefits only indirectly and as a result of the insurer's duty to defend.  Were it otherwise,

the insurer's independent right under the insurance contract to defend a claim in which it might

ultimately be liable, such that its own interests in a final judgment in favor of the insured are at

stake would be subject to the whims of the insured—or anyone standing in the shoes of the

insured—rendering the insurer's contractual right to defend the claim illusory.

This case falls within the latter category.  Under the reservation of rights letters submitted

by the parties, McDevitt did not elect to assume the defense.  He left it to LSM to select counsel

to defend against the claim.  The default under the Policy applies—LSM has both the right and

the duty to defend against the claim.  Any costs incurred in the defense run directly from LSM to

counsel; they do not run through McDevitt.  McDevitt has only an indirect interest, no different

from Lakian's interest in the *Lakian* cases.

The supplemental briefing submitted by McDevitt supports this conclusion.  Appended to

his briefing, McDevitt includes WSHB's Retention Agreement.[10]  Dkt. No. 124-1.  That

---

[10] KLS asserts that this document "does not appear to be the Written Engagement Letter required by Part 1215 to Title 22 of the Official Compilations of Codes, Rules and Regulations of the State of New York," and instead seeks to characterize it as "LSM's instructions to WSHB."  Dkt. No. 126.  Aside from the fact that it favors McDevitt's position and not its own, KLS asserts no cogent reason to suspect that this retention letter is not the operative engagement letter.  It merely offers speculation that some other letter might exist.  KLS concedes that a written agreement with a third party paying the bills satisfies the rule, *see id.*, provided that "the agreement addresses the matters set forth in subdivision (b)."  *Id.* (quoting Section 1215.1(3)).  Those matters include attorney's fees to be charged, expenses, and billing practices.  *Id.*; *see also* Section 1215.2.1.  KLS asserts that the document at issue—the retention agreement—does not address these matters; as set forth in detail below, it plainly does.  There is thus no genuine

agreement is between LSM and WSHB—not between McDevitt and WSHB—and states that

LSM is "pleased to confirm LSM's retention of your law firm [WSHB] to defend the Insured

Person, Sean McDevitt, in connection with the action filed by KLS Diversified Master Fund,

L.P. in the United States District Court for the Southern District of New York, Case No. 1:19-cv-

03774."  *Id.*  It further provides detailed terms and conditions of the firm's retention, including a

requirement that the firm provide LSM with an initial report within sixty days of receipt that

must "contain a projection of costs for the anticipated work that will be performed and the

estimated expense associated with that work," on a budget form provided by LSM, a requirement

that the firm "provide a supplemental budget form as soon as possible" if that projection of costs

evolves, and a requirement that if the case proceeds to trial, LSM receive "daily status reports

and an updated projected budget."  The letter outlines terms and conditions for billing:

> **Billings**.  As advised, LSM has retained your firm to defend the Insured.  LSM
> hereby agrees to pay all reasonable and approved Defense Costs incurred by your
> firm that are in excess of the Insured's self-insured retention.  All billings should
> be sent to the undersigned law firm, on behalf of LSM, with a copy to the Insured.
> Please include our firm's file number on all invoices.  Billing statements must be
> itemized and include full descriptive summaries of all the services performed and
> charges incurred.  The descriptive summaries should indicate the date the service
> was performed, the person performing the service, and the amount of time for that
> service.  Billings must be in increments of .10 hr.

*Id.*  The letter further details—among many other terms and conditions—certain expenses that

LSM will not pay for ("LSM will not pay for local telephone calls, secretarial overtime, word

processing, supplies, etc., which LSM considers part of a firm's overhead."); the hourly rates

presumably discussed in advance by LSM and WSHB ("This will confirm that your firm will be

charging hourly rates of $300 for Partner time, $260 for Senior Counsel and Senior Associate

time, $220 for Associate time, and $130 for Law Clerk and Paralegal time.  We expect that you

---

dispute raised—beyond mere speculation and belated attempts for discovery—that the retention
agreement is the operative engagement letter.

will staff this matter in an appropriate manner."); and restrictions on how many attorneys can

attend proceedings; ("Unless otherwise approved in advance, only one attorney is authorized to

attend interviews, depositions, meetings, court appearances, etc."). Each of these terms

reinforces the understanding both that the right to payment of fees incurred by WSHB runs

directly from WSHB to LSM and that LSM, not McDevitt, dictates how the LSM Policy's funds

for McDevitt's defense are to be spent. If LSM failed to pay WSHB, WSHB's breach of

contract claim to such fees would be against LSM, not against McDevitt.[11]

     Thus, McDevitt enjoys no direct interest in the funds being used to compensate WSHB.

He is at most a third-party beneficiary to the retention agreement between WSHB and LSM,

entered into pursuant to LSM's right and duty to defend against a claim under the LSM Policy.

The right to payment for legal fees incurred in connection with McDevitt's defense runs directly

from WSHB to LSM; LSM, not McDevitt, dictated the terms of WSHB's retention, fees, and

billing. LSM's payments to WSHB came from its own assets, in satisfaction of its own

obligations to WSHB under the LSM Policy and the retention agreement. As such, McDevitt has

no current non-contingent interest in the proceeds of the LSM Policy that are or will be owed by

---

[11] KLS asserts that, "if the engagement letter does not reserve WSHB's right to seek payment from McDevitt, WSHB would have an action in quantum meruit against McDevitt." Dkt. No. 125 at 1 (citing *Chernis v. Swarzman*, 2007 WL 2230078 (S.D.N.Y. Aug. 2, 2007)). That argument highlights the central flaw in KLS's argument. Under New York law, an action lies in quantum meruit only when the plaintiff enjoys no contractual right against the defendant. *See Valley Juice Ltd., Inc. v. Evian Waters of Fr., Inc.*, 87 F.3d 604, 610 (2d Cir. 1996) (holding that the existence of an enforceable contract governing a particular subject matter "ordinarily precludes recovery in quasi contract for events arising out of the same subject matter"). In other words, the existence of a claim by WSHB in quantum meruit against McDevitt would necessarily rest upon the absence of any right that WSHB would enjoy directly under contract law against McDevitt. If that is so, then it would necessarily follow that WHSH's right to be paid does not run through McDevitt but runs directly against LSM.

LSM to WSHB, nor do those proceeds constitute a debt from LSM to McDevitt which KLS can attach.  It follows that the LSM restraining notice is invalid.[12]

## CONCLUSION

The motion to vacate the restraining notices is GRANTED IN PART AND DENIED IN PART.

The Clerk of Court is respectfully directed to close Dkt. No. 104.


SO ORDERED.

Dated: January 25, 2022
      New York, New York

_____
LEWIS J. LIMAN
United States District Judge

---

[12] Because this pertains only to LSM's ability to pay WSHB, the same conclusion does not follow with regard to the restraining notice to McDevitt.